1

2

3

4

5　　　　　　　　**UNITED STATES DISTRICT COURT**

6　　　　　　　**SOUTHERN DISTRICT OF CALIFORNIA**

7

8　ANDREW T. THOMASSON, REBECCA J.　　　CASE NO. 05cv0940-LAB (CAB)
　　THOMASSON, MACDONALD P.
9　TAYLOR JR., and CHENOA R. TAYLOR,　　　**ORDER:**
　　on behalf of themselves and all others
10　similarly situated,　　　　　　　　　　　　**1. GRANTING DEFENDANT'S**
　　　　　　　　　　　　　　　　　　　　　　　**MOTION FOR SUMMARY**
11　　　　　　　　　　　　　　Plaintiffs,　　　　**JUDGMENT;**

　　vs.
12　　　　　　　　　　　　　　　　　　　　　**2. DENYING AS MOOT**
　　　　　　　　　　　　　　　　　　　　　**DEFENDANT'S MOTION FOR**
13　　　　　　　　　　　　　　　　　　　　　**LIMITATION ON**
　　　　　　　　　　　　　　　　　　　　　**COMMUNICATIONS WITH**
14　　　　　　　　　　　　　　　　　　　　　**PUTATIVE CLASS MEMBERS;**
　　　　　　　　　　　　　　　　　　　　　**AND**
15　GC SERVICES LIMITED PARTNERSHIP,
　　and DOES 1 through 25, inclusive,　　　　　**3. DENYING AS MOOT**
16　　　　　　　　　　　　　　Defendants.　　　**PLAINTIFFS' MOTION TO**
　　　　　　　　　　　　　　　　　　　　　**CERTIFY CLASS**
17
　　　　　　　　　　　　　　　　　　　　　[Dkt Nos. 144, 133, 84]
18
　　　　　This matter is before the court on defendant GC Services' Motion For Summary Judgment

19
("Motion") in this putative class action alleging violations of the federal Fair Debt Collections
20
Practices Act and state privacy laws.  Plaintiffs filed Opposition, and GC Services filed a Reply.
21
Pursuant to Civ. L. R. 7.1(d)(1), the court finds the issues appropriate for decision on the papers and
22
without oral argument.  For the reasons discussed below, the Motion is **GRANTED**.  Two other
23
pending motions are rendered moot by this Order and are, on that basis, **DENIED**.
24
**I.　　BACKGROUND**
25
　　　　　**A.　　Factual Background**
26
　　　　　Plaintiffs originally were two California residents and two Delaware residents purporting to
27
sue under the Fair Debt Collection Practices Act ("FDCPA") and under the privacy laws of numerous
28
states and commonwealths on behalf of themselves and all others similarly situated, described as "a

class consisting of all persons who engaged in at least one telephone conversation with a person employed by Defendant GC SERVICES participating therein and *who have had* said conversations with a GC SERVICES employee recorded and/or monitored and/or eavesdropped upon."[1]   First Amended Complaint ("FAC") ¶ 41 (emphasis added).   Only the California residents, Andrew T. Thomasson and Rebecca J. Thomasson, remain named plaintiffs, and only the state law claims arising under California law remain.[2]

The FAC[3] alleges GC Services operates call centers located throughout the United States, each staffed with debt collector employees of GC Services who initiate and receive telephone contacts with persons located in each of the United States and Puerto Rico.   GC Services contracts with creditor companies in various industry sectors such as automotive, retail, telecommunications, and financial for collections on behalf of banks, credit card companies, telecommunications companies, utilities, and federal, state, and municipal governments, courts, and student loan programs, among others, to provide collection or other services.  FAC. ¶ 14; FAC Exh. A.  GC Services identifies itself as "a Texas-based company providing third-party debt collection services and an array of other 'teleservices' operations apart from debt collection." Mot. P&A 3:11-13; Wojcicki Depo. citations, Mot. P&A 3:13-15. "GC Services conducts third-party debt collection operations out of nineteen (19) facilities located in twelve

---

[1]   The putative  class period is alleged to be "one year prior to May 4, 2005" with respect to the FDCPA claims, and with respect to the state law claims, the applicable "statute of limitations relevant to [California's] statute concerning the recording and/or monitoring and/or eavesdropping upon telephone conversations." FAC ¶ 42.   In California, the applicable statute of limitations of CAL. PENAL CODE § 637.2 is one year.  GC Services pleads statute of limitations as its Second Affirmative Defense. FAC Ans. 8:2-4. Plaintiffs contend any statute of limitations argument is "misplaced" because they characterize the conduct giving rise to this action as "surreptitious," so the limitations period would not begin to run until the "claimant know or has reason to know she has been subject to an unlawful act." Opp. p. 2, no. 2, *citing* Nodine v. Shiley, Inc., 240 F.3d 1149, 1153 (9th Cir. 2001).   However, the Motion addresses only the situation of the two remaining named plaintiffs, so the only relevant trigger at this point is their discovery.  As discussed below, each of them learned of the potential calls might be monitored during their first conversation with GC Services.

[2]   *See* Dkt No. 162, Joint Statement Of Undisputed Facts, Fact No. 1 ("None of the named plaintiffs are asserting claims under the laws of Connecticut, Florida, Illinois, Maryland, Massachusetts, Michigan, Montana, Nevada, New Hampshire, Pennsylvania, Washington, or Puerto Rico."  The laws of those states and California are alleged to have been violated by GC Services conduct giving rise to this litigation, leaving only California law (*i.e.*, CIPA § 632) and the federal Fair Debt Collection Practices Act ("FDCPA") as the legal theories for relief. *See* FAC ¶ 2.  For purposes of deciding this Motion, the court accordingly need not address the parties' dispute at the time the briefing of the Motion occurred whether Kearney v. Solomon Smith Barney, Inc., 39 Cal.4th 95 (2006)  proscribes CIPA claims by non-Californians. *See* Opp. 23:5-24:27.

[3]   Leave to file a Second Amended Complaint was previously denied. Dkt No. 154.

1   (12) different States." Id. at 4:2-4, *citing* Wojcicki Decl. ¶ 4.  It provides "collection services for

2   thousands of leading commercial companies and hundreds of state and federal government agencies

3   . . . ." Id. at 3:18-20, *citing* Wojcicki Decl. ¶ 2.  "In California, GC Services operations are limited to

4   (1) two consumer debt collection facilities, in San Diego and Irwindale, and (2) a collection center

5   operated out of Irwindale for the Los Angeles County Superior Court."  Mot. P&A  4:4-7, *citing*

6   Wojcicki Decl. ¶ 4.  The special services for the Superior Court are not at issue here.

7        GC Services "admits that in the ordinary course of its business, GC Services periodically

8   monitors its own telephone conversations with debtors, for quality control purposes. . . ." FAC Ans.

9   ¶ 58.  Plaintiffs characterize GC Services' call monitoring practice as "eavesdrop[ing] on millions of

10  exchanges a year," while "[m]ost callers do not realize that they may be taped even while they are in

11  [*sic*] hold." FAC ¶ 12.  The FAC identifies the "principal issue" in this case as "whether Defendant

12  GC Services violated the FDCPA and the laws of [California]. . . regarding recording and/or

13  monitoring and/or eavesdropping upon telephone calls." FAC ¶ 44.  Plaintiffs' contend:

14           [T]his suit **seeks to alter the conduct of GC Services in California**
             vis-a-vis residents of this state and others.  The State of California has
15           an interest in ensuring that employees working within this state comply
             with its laws. . . . .  The simple fact is that companies operating in
16           California -- including GC Services -- are required to follow California
             law, no matter the residence of the individual with whom they are
17           speaking.

18  Opp. 24:8-14 (emphasis added), *relying on* Kearney v. Solomon Smith Barney, Inc., 39 Cal.4th 95,

19  104 (2006).[4]

20       The FAC alleges putative class representative Rebecca Thomasson received a written debt

21  collection notice from GC Services in January 2005 representing she owed $25.00 to an entity doing

22  business as "Telecheck." FAC ¶ 29.  **She placed a telephone call** to GC Services to discuss the

23  indebtedness and spoke with an unidentified female employee.  The employee did not advise her at

24  any time the call might be recorded or monitored.  FAC ¶ 30.

25

26       [4] Kearney is primarily a choice of law case, a putative class action lawsuit arising from the defendant
    brokerage firm's **recording** of phone calls between the plaintiffs in California and its representatives located
27  in Georgia without plaintiffs' knowledge or consent, where California and George had conflicting privacy
    statutes (California requires disclosure to all parties to the conversation, whereas Georgia is a non-party
28  consent state).  Kearny's purported conflict with the CPUC General Order is immaterial to the result here
    because the court declines to reach GC Services' CPUC preemption argument in deciding this Motion.

1    Ms. Thomasson testified at her October 2006 deposition **she had left voice messages** in

2  January 2005 at the number provided in the collection notice.  She also testified that thereafter **she**

3  **called** a different phone number for GC Services when she received no return phone call responsive

4  to her voice mail and spoke with a  a woman representative to find out why she had received the

5  written notice. Schroth Decl. Exh. A, 29:1-30:7.  The representative asked her for contact information

6  and a bank account number "if I wanted to take care of it right then." Id. 30:14-21.  Ms. Thomasson

7  declined to give a bank account number.  She testified she could hear "some background noise going

8  on" such as people talking, so **she asked** whether anyone was listening or if the call was being

9  recorded.  "So she said yeah, that they do record, they do monitor," and that "someone [was] listening

10  in," then Ms. Thomasson ended the call.[5]  Id. 31:3-20, 32:12-13 (emphasis added).

11    Ms Thomasson testified **she called GC Services again** in February 2005, in response to

12  another written notice about the same Telecheck account, again using the number enabling her to

13  "bypass[] the whole voice mail deal" associated with the number provided in GC Services' written

14  notice to her.[6]  Schroth Decl. Exh. A, 32:17-33:9.  Ms. Thomasson talked to a GC Services

15  representative, who asked for the same information as before.  She gave the representative "my name,

16  address, phone number to verify who I [sic] was calling," but no bank account number.  Id. 33:16-2.

17    Q.    Did the representative tell you whether or not your call might be
       monitored or recorded?
18
   A.    No. . . .[¶]  Well, not until I said something.
19
   Q.    But your prior experience in January, you knew that your call
20        might be monitored or recorded because that is something GC
          Services did?
21
   A.    Right.
22
Shroth Decl. Exh. A, 34:8-16.
23
     Ms. Thomasson testified she ultimately paid the account.  She **did not call GC Services again**
24
**for several months**, until July 2005, to follow up on her Telecheck account and her husband's MCI
25

26    [5]  "Q:  Did the -- at any time during the January call, did this representative tell you that your call
   might be recorded?  A.  No.  I believe her exact words were you are being monitored, yes, someone is
27  listening."  Shroth Decl. Exh. A, 36:5-8.

28    [6]  She apparently obtained that number from Mr. Thomasson, who received a separate debt collection
   notice from GC Services regarding an alleged MCI debt providing a different GC Services number.

1   account, the subject of a different GC Services collection effort.  Shroth Decl. Exh. A, 37:9-38:34.

2   The person who answered asked for her identifying information (name, phone number, address), and

3   she also gave them both the Telecheck and MCI account numbers.  Id. 38:7-6.  She was told her

4   account was cleared, and she thinks they gave her the amount of her husband's alleged MCI debt.  She

5   did not receive any advisement that her call might be monitored, but based on her previous

6   conversations with GC Services, she knew of that possibility.  Id. 38:23-39:11.  She testified she does

7   not know whether GC Services actually monitors every telephone conversation.  Id. 41:11-13.  The July

8   2005 call was her last communication with GC Services.  Id. 40:12-25.

9        From her testimony, the evidence of Ms. Thomasson's conversations with a GC Services

10  representative consists of about **three telephone calls, all of which she herself initiated** in response

11  to two written notices, and the leaving of voice mail when she first called the number provided in her

12  written notice.  She learned during the course of the first conversation of the company's policy to

13  monitor some of its telephonic communications with consumers.

14       The FAC alleges GC Services engaged in actionable conduct with putative class representative

15  Andrew Thomasson in April 2005.  The FAC alleges he received a written notice from GC Services

16  about a debt in the amount of $28.61 he purportedly owed to MCI Company.  In response, **he placed**

17  **a call** to the toll-free number provided in the letter and spoke with a GC Services debt collector

18  employee named "Ashley."  FAC ¶¶ 21-25.  He testified at his deposition he called to let GC Services

19  "know that I had disputed it in writing" (apparently to MCI) and he "wanted to make sure that they

20  noted their file" so it would not go on his credit report.  Shroth Decl. Exh. A, A. Thomasson Depo.

21  29:6-24.  He testified Ashley "said something like she wouldn't talk to me about the debt until I

22  provided certain information to her to identify who I was or something like that," such as "contact

23  information," "address," "account number" and maybe telephone number.  Id. 30:3-18.  He gave her

24  that information.  Id. 30:22-23.  He told her he had been an MCI customer, but he did not think he

25  owed the money and asked her to send him some verification, such as an MCI record.  He thinks she

26  said she would do so.  Id. 31:2-33:1.  Toward the middle or end of the call, Mr. Thomasson testified

27  he heard "something that made me think that someone was listening," like a "scratching or a clicking

28  or like a conversation, background."  Id. 32:3-17.  He asked Ashley if someone was listening in on the

conversation.  She said she did not know, but someone might be.  Id. foll. p. 32, ll. 8-13.  He said goodbye and ended the call.  Id. foll. p. 32, ll. 18-22; *see* FAC ¶¶ 26-28.  He also testified he thought Ashley said in the course of that conversation "they record or monitor all of them or . . . something to that effect, that, you know, they have a policy of doing that." Id. 34:2-5.  He testified he does not know where Ashley was geographically located.  Id. 34:16-21.  He never received the verification from GC Services about the alleged MCI debt (Id. 34:22-24), but nor does he contend GC Services ever contacted him thereafter.

Mr. Thomasson testified **he called GC Services a second time** "a month or two later," but does not recall with whom he spoke.   Shroth Decl. Exh. A, A. Thomasson Depo. 34:6-15, 35:8-12. He wanted to make sure nothing was being reported on his credit report, wanted to know what they had done with the debt, and whether they were going to send him verification because he "had heard nothing." Id. 35:16-19.  He was told GC Services had "closed the account, or something like that." Id. 35:14-23.  "[T]hey didn't advise me they were going to monitor or record that conversation." Id. Mr. Thomasson's deposition excerpts include a discussion of some prior testimony he provided.

> Q.    In Paragraph 9 you indicate that you were asked for certain information from the GC Services employee, and you conclude with the sentence, "I would not have consented to, or participated in, this telephone call had I known that it was being monitored or recorded by another individual" . . . . [Q.] My question is simply, why not?
>
> A.    I just find it personally offensive that when you believe you're talking to someone and you're sharing information that you wouldn't ordinarily just call someone up out of the blue and give, that if you have someone on the other line that's listening to you, not telling you they're there, that to me is offensive.  I think that all parties to a conversation should announce themselves.
>
> Q.    Any other reason?
>
> A.    I consider this information private.
>
> Q.    And so this is information that you were willing to give to the GC Services employee with whom you were talking, correct, Ashley?
>
> A.    No, that's not correct.
>
> Q.    Okay.  Did you give this information to Ashley?
>
> A.    Yes.

Q.    And is it your testimony that you would not have given the information to Ashley if you had known that someone else from GC Services was listening to the call?

A.    Yes.

Shroth Decl. Exh. A, A. Thomasson Depo. 54:11-55:13.

Mr. Thomasson elaborated his concerns, in addition to personal offensiveness, to be the increased potential for misuse or identity theft when information is given to more than one person.[7]

Shroth Decl. Exh. A, A. Thomasson Depo. 55:20-56:12.

Q.    Was it your understanding that Ashley would keep the information that you were giving to herself?

A.    I don't know.

Q.    You don't know whether she was going to use the information in order to help GC Services contact you in the future?

A.    I mean, I -- I'm really not sure.  I think my -- I can just say I'm not sure what.

Q.    Among the information that she asked you for and you provided was contact information, correct?

A.    That is among the information.

Q.    What do you understand GC Services was going to do with that contact information for you?

A.    I don't know.

.  .  .  .

Q.    Let me direct your attention to Paragraph 14, which is on the following page of your declaration. In the . . . third sentence of Paragraph 14 you make this statement, and I quote: Specifically, I am very protective of my personal and private information, and I am very unhappy that GC Services freely shared that personal information with others without my consent.  [¶]  Do you see that [quote]?

A.    Yes.

Q.    Who are the others with whom GC Services shared your personal information without your consent?

A.    Well, the other person that monitored that conversation, anyone that listened to the recording.  Others.

---

[7]    There is no allegation in the FAC of actual identify theft or misuse of financial or other personal consumer information obtained during the calls.

Q.   Do you know whether these others were or were not employees of GC Services?

A.   I have no idea who they shared the information with.

Shroth Decl. Exh. A, A. Thomasson Depo. 56:13-58:17.

GC Services denies it ever monitored or recorded a telephone conversation with Mr. Thomasson and asserts "there is no evidence to the contrary." Mot. 7:6-8, *citing* Exhibit 7 at 15. GC Services summarizes Mr. Thomasson's testimony:  "The record shows that Andrew Thomasson had telephone conversations with GC Services, but he admits that defendant advised him about its call monitoring practices in the very first telephone call he had with the company." Mot. 7:2-6, *citing* FAC ¶ 27; A. Thomasson Depo. dated July 18, 2006, at 33:11-13.

Based on the Thomassons' telephone conversations with GC Services employees, the FAC alleges as its First Cause of Action violations of the FDCPA, 15 U.S.C. § 1692e:  (1) using false, deceptive, and misleading means in an attempt to collect alleged consumer debts, including among other things **not revealing "to consumers that telephone conversations with collectors might be recorded and/or monitored and/or eavesdropped upon**," so that "persons engaged in these telephone conversations, . . . *may have* revealed personal financial information to debt collectors employed by Defendant GC Services more freely, all to the economic benefit of Defendant GC Services;" and (2) falsely representing the character and legal status of alleged consumer debts," in particular violation of 15 U.S.C. § 1692e(2)(A). FAC ¶ 49 (emphasis added).  Plaintiffs seek statutory damages for the class and "for the plaintiff" pursuant to 15 U.S.C. § 1692k.

The Second Cause of Action alleges GC Services illegally records conversations between the consumer putative class and GC Services' debt collection personnel, "in violation of applicable state/commonwealth laws prohibiting the recording of telephone calls without two-party consent."[8] FAC ¶ 52.  The "surreptitiously recorded telephone calls were 'confidential communications,' within the meaning of" the California statute criminalizing invasions of privacy, CAL. PENAL CODE §§ 630, *et seq*.("CIPA"), and plaintiffs had a reasonable expectation of privacy and "an objectively reasonable expectation that his or her call was not being recorded."  FAC ¶ 54.

---

[8]  In the current posture of the case, the viability of the Second and Third causes of action are decided under California law alone.

The Third Cause of Action alleges GC Services illegally monitors or eavesdrops on its telephone conversations with consumers without the consent of the participating putative class member, in violation of California's statute.  FAC ¶¶ 52-53.  CIPA § 632(a) applies when a person actually "eavesdrops upon or records" a confidential communication.  Plaintiffs seek statutory damages and injunctive relief under state law for alleged "illegal recording of conversations" (FAC 11:5-6) and for alleged "illegal monitoring/eavesdropping of conversations" (FAC 12:14-15).

GC Services now moves for summary judgment, arguing:  (1) plaintiffs have no evidence it violated Section 1692e of the FDCPA; (2) plaintiffs have no evidence that GC Services recorded any conversations with debtors in violation of CIPA; and (3) "[t]he fact that GC Services periodically monitors its own business telephone conversations with consumer debtors for purposes of training and quality assurance, in the normal course of business, is not a violation of California Penal Code section 632(a). . . ."  Not. of Mot. 2:1-10.  GC Services also argues preemption theories, contending *inter alia* the California Public Utilities Commission ("CPUC") provides the exclusive state law basis for pursuit of plaintiffs' claims as CPUC has jurisdiction over the regulation of "business call monitoring."

Plaintiffs oppose the Motion on grounds:  "(1) genuine disputes of material facts exist, precluding entry of summary judgment; (2) to the extent facts are not disputed, those facts would require entry of judgment in favor of Plaintiffs on all claims[9]; (3) GC Services['] affirmative defenses are alternatively inapposite to the case at bar or fail as a matter of law;[10] and (4) Plaintiffs have been stonewalled in discovery, a contention borne out by the record before the Court," accompanied by a request for "leave to reopen discovery," with "the Defendant's motion denied or a continuance ordered. . . ."[11]  Plaintiffs also urge the court to "set aside" GC Services's CPUC preemption argument on the

---

[9]   The court rejects this argument as a procedurally impermissible attempt to convert plaintiffs' Opposition into their own summary judgment motion without proper notice and without observing the formalities of motion practice in this court.

[10]   To the extent this argument purports to support summary adjudication in plaintiffs' favor, and to the extent it misconstrues opposition standards applicable to the court's ruling on the Motion, the court ignores the showings as inappropriate and immaterial to this result.

[11]   The court declines to revisit the extensive discovery disputes and rulings by the Magistrate Judge associated with the discovery process in this case.  It does not appear from the docket that plaintiffs have been diligent in pursuing discovery. For example, defendant's counsel represented at the time this Motion was filed: "Throughout the course of discovery in this case, plaintiffs[] have produced five pages of documents -- none

CIPA claims on grounds it is an affirmative defense that should have been "asserted at an earlier date," or are "flawed" and "inapplicable" theories.  Opp. P&A 18:4-11.  On the latter issue, contrary to Plaintiff's insinuation, GC Services expressly pled preemption as its Ninth Affirmative Defense (FAC Ans. 8:6-12), so the court need not address any argument of belated assertion of that defense.

The court confines this decision to application of the FED. R. CIV. P. ("Rule") 56 standards to the record presented.[12]  The burdens on moving and non-moving parties differ in the summary judgment context, and Plaintiffs have not proceeded with a cross-motion, but rather elected to simply oppose GC Services' motion.  Contrary to Plaintiffs' arguments, the court cannot conclude the "evidence conclusively shows" anything requiring a finding that non-moving "Plaintiffs must prevail as a matter of law."  Opp. 9:19-22.  The court makes no findings of fact in deciding the motion.  In addition, the court rejects any discovery-related or other requests for affirmative relief Plaintiffs attempt to piggy-back on their Opposition as inappropriate, untimely, and obfuscating.

Cutting through the extensive and frequently extraneous argument, the court accepts Plaintiffs' foundational statement distilling the alleged wrongdoing common to both the FDCPA and The CPIA claims:  **"GC Services fails to provide such an advisement** [*i.e.*, "that calls to or from GC Services may be monitored or recorded"] 'at the outset' of telephone calls it conducts with debtors (assuming *arguendo* it does so at all), **which constitutes the basis for liability in this case.**"[13]  Opp. 1:25-27

---

of which relate to plaintiff Rebecca Thomasson."  L'Estrange Decl. ¶ 12.

[12]   Plaintiffs misstate the applicable standards.  First, they contend "the trial court is required to determine whether the evidence adduced through discovery presents sufficient disagreement to require submission to a jury, **or is so one-sided that *one party* must prevail as a matter of law."**  Op. 8:5-7 (emphasis added).  The court rejects plaintiffs' pretensions to summary judgment in its favor without bringing its own motion.  Second, defendant as the moving party is not required to "prove" anything it does not have the burden of proof on at trial, contrary to plaintiffs' suggestion and their insinuation "pleadings" are evidence.  Opp. 8:8-10.  Third, the "weight" of the evidence has no bearing on a Rule 56 determination.  The court makes no findings of fact nor assessment of "credibility."  *See* Opp. 8:24-26.

[13]  "**POLICIES AND PRACTICES COMPLAINED OF**.  It is the policy and practice of Defendant GC SERVICES **to initiate telephone communications with persons, such as the Plaintiffs named herein, and to accept telephone communications from persons, such as the Plaintiffs named herein, and to record and/or monitor and/or eavesdrop upon said telephone calls, without advising these persons that said telephone calls are being recorded and/or monitored and/or eavesdropped upon**, all in violation of the relevant state/commonwealth laws prohibiting same [now narrowed to California law only], and which conduct otherwise constitutes false, deceptive and misleading debt collection means in violation of the FDCPA.  Said false, deceptive, and misleading conduct occurs from the fact that persons engage in these telephone conversations, wherein said persons may have revealed personal financial information, without knowing that

(emphasis added); *see also* Opp. 7:5-8 (  "GC Services' telephone calls with (to or from) consumers are either monitored, or recorded, or both, and GC Services fails to inform these alleged debtors of the surreptitious conduct." Plaintiffs represent:  **"[A]ll that would have been required for GC Services to comply with the laws at issue in this case would be to provide an advisement at the outset of conversations with consumers that calls to or from GC Services may be monitored or recorded."** Opp. 1:23-25 (emphasis added).  Despite the indiscriminate and undisciplined scope of argument and the parties' extravagant indulgence in sealing documents in this case, including facially innocuous materials,  Plaintiffs' burden to avoid summary judgment was simply to raise a discrete triable issue of material fact through admissible evidence to defeat GC Services' evidentiary showing it does not record debt collection calls, its policies regarding monitoring of debt collection calls is for its employees,  once they ascertain they are speaking to the alleged debtor, to give an advisement the calls may be monitored, or GC Services' conduct with respect to the named Plaintiffs involved an illegitimate collection practice.

## B.    Procedural Background

By Order entered May 30, 2006, this court denied GC Service's Rule 12(c)  Motion For Partial Judgment On The Pleadings seeking to eliminate the FAC claims of improper recording and eavesdropping on calls under state law on grounds of:  federal preemption by the Omnibus Crime Control And Safe Streets Act, 18 U.S.C. § 2510, *et seq.* ("Title III"); impossibility of "eavesdropping" on one's own conversations; failure to allege "third party" eavesdropping; and failure of the named plaintiffs to allege their own conversations were actually monitored or recorded, depriving them of standing to seek vindication of the rights of those whose calls were actually monitored or recorded. Dkt No. 52.  Plaintiffs at that time confirmed their FAC does not seek recovery for "eavesdropping" under CIPA section 631 (criminalizing wiretapping), but rather proceeds only under CIPA section 632.[14]  Dkt No. 15 3: 23-25, 6:11-12, 8:16.  The court found it was unable to conclude as a matter of

---

the telephone conversations may be recorded and/or monitored and/or eavesdropped upon."   FAC ¶ 40 (emphasis added).  The evidentiary record discussed below proves the contrary.

[14]   "Every person who, intentionally and without the consent of all parties to a confidential communication . . . eavesdrops upon or records such confidential communication," by its own terms, violates CAL. PENAL CODE § 632.

law the Second cause of action (alleging illegal recording of conversations) and the Third cause of action (alleging illegal monitoring/eavesdropping) are necessarily preempted by federal law, or that Plaintiffs could prove no set of facts under any of the multiple state and commonwealth laws asserted in the FAC entitling them to relief based on GC Services business call monitoring practices. Similarly, from the face of the FAC alone the court could not conclude the Thomassons could prove no set of facts entitling them to relief on the allegations their conversations with a GC Services employee were recorded/monitored/eavesdropped upon without their consent. The procedural posture and applicable standards of review on summary judgment are different from judgment on the pleadings standards, and an evidentiary record now exists that may be considered..[15]

A Protective Ordered issued in this case in March 2003 and has been invoked by the parties to seal an extraordinary and -- in this court's view -- exaggerated volume of materials, most containing information of either marginal or no sensitivity warranting a designation of "confidential," "trade secret," "attorneys' eyes only," or the like. The excessive nature of the parties' wholesale approach to sequester the evidence extended even to the sealing of their points and authorities briefing in their entireties. The court declines to seal this Order as unnecessarily restrictive and finds the sealing authorization accorded the parties' Motion papers was improvidently permitted.

**II.    DISCUSSION**

**A.    <u>Legal Standards Re Summary Judgment</u>**

Summary judgment is properly entered if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P.

---

[15]    Plaintiffs' contention this Rule 56 motion should be denied because of the court's purported "agreement" with their positions at the time it denied GC Services' Rule 12(c) Motion For Partial Judgment On The Pleadings (Dkt No. 52) with respect to statement of a FDCPA claim and a CIPA claim ignores the wholly different standards applicable to those very different proceedings, and grievously misrepresents the record. *See* Opp. 7:2-6, 7:13-18 ("certain of GC Services' legal arguments on summary judgment have already been briefed and roundly rejected in its motion for judgment on the pleadings," forcing them "to prove what has already been demonstrated: GC Services is not entitled to summary judgment"). Such a representation ignores the court's expressed intention in ruling on that motion to await a fully developed evidentiary record before making any such determination. Similarly, Plaintiffs' insistence the court must find GC Services is not entitled to summary judgment in consideration of the "weight" of the evidence, the "credibility" of the evidence, and the "amassed" volume of evidence takes no account of the prohibition under Rule 56 that the court consider any of those things in deciding a Rule 56 motion, and that a defendant has no obligation to prove anything as the moving party regarding issues on which the plaintiff retains the burden of proof at trial.

("Rule") 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 323 (1986) (the moving party bears the initial responsibility to inform the court of the basis of its motion and to identify those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact"), *quoting* Rule 56(c).  If the moving party shows there is an absence of evidence to support the non-moving party's claims, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u> 477 U.S. 242, 256 (1986).

To successfully rebut a properly supported motion for summary judgment, a plaintiff "must point to some facts in the record [beyond the pleadings] that demonstrate a genuine issue of material fact and, with all reasonable inference made in the plaintiff['s] favor, could convince a reasonable jury to find for the plaintiff[]." <u>Reese v. Jefferson School Dist. No. 14J</u>, 208 F.3d 736, 738 (9th Cir. 2000), *citing* Rule 56, <u>Celotex</u>, 477 U.S. at 323, and <u>Anderson</u>, 477 U.S. at 249; *see* <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).  The party opposing the motion "must present significant probative evidence tending to support its claim. . . ." <u>Intel Corp. v. Hartford Accident & Idem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation omitted).  A non-moving party may not rely on mere denials in their own affidavits to create a genuine issue of material fact.  <u>Hansen v. United States</u>, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact").  "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." <u>Far Out Products v. Oskar</u>, 247 F.3d 986, 997 (9th Cir. 2001) (affirming summary judgment where appellant's affidavits submitted to defeat summary judgment were conclusory).

"A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." <u>S.E.C. v. Seaboard Corp.</u>, 677 F.2d 1301, 1306 (9th Cir. 1982).  "If reasonable minds could differ," judgment should not be entered in favor of the moving party. <u>Anderson</u>, 477 U.S. at 250-251.  However, summary judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." <u>Id.</u>  In deciding the motion, the court does not make credibility determinations nor weigh conflicting evidence, as those

are determinations for the trier of fact and inappropriate for summary adjudication proceedings.[16] Anderson, 477 U.S. at 249.

## B. Standing And Representative Plaintiffs

The FAC is the operative pleading in this putative class action.[17]   It defines the putative class as:  "all persons who engaged in at least one telephone conversation with a person employed by Defendant GC SERVICES participating therein ***and who have had*** said conversations with a GC SERVICES employee recorded and/or monitored and/or eavesdropped upon." FAC ¶ 41 (emphasis added). The only remaining putative class representatives are Andrew Thomasson and Rebecca Thomasson.  Plaintiffs have produced no evidence to show one or more of their telephone calls to GC Services was actually monitored or recorded, despite a prolonged and contentious discovery period, including Orders compelling such discovery.

A putative class action must have as representative plaintiffs persons who themselves have Article III standing, that is, who can show the requisite case and controversy between themselves personally and the defendant.  Warth v. Seldin, 422 U.S. 490, 500-01 (1975) ("the plaintiff still must allege a distinct and palpable injury to  himself even if it is an injury shared by a large class of other possible litigants").  Otherwise, they have no standing to seek relief neither on their own behalf nor on behalf of putative class members.  Lierboe v. State Farm Mut. Auto. Ins. Co., 350 F.3d 1018, 1022 (9th Cir. 2003) ("the named representatives must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent").

---

[16]   Plaintiffs again misstate the Rule 56 standards and ignore the respective burdens on a moving party and on a non-moving party, and their Opposition suffers accordingly.  *See* Opp. 8:14.  A defendant as the moving party need not "prove"  there is no genuine issue as to any material fact.  The court does not *sua sponte* decide on summary judgment whether "the evidence . . . is so one-sided that *one party* must prevail as a matter of law."

[17]   The Motion To Certify Class was filed June 30, 2006.  Dkt No. 84.  Plaintiffs refer to and rely on their "Second Amended Complaint" ("SAC") for their putative class description and for their statement of allegations (*see. e.g.*, Motion To Certify Class P&A 13:7-9), stating "[t]he remaining Plaintiffs' have, therefore, moved this Court for leave to file the SAC referenced in this Motion."  Mot. To Certify Class P&A 13:7-8. However, Plaintiffs did not file their motion for leave to file a SAC until July 5, 2006.  Dkt No. 90.  Leave was denied by Order entered November 2, 2006.  Dkt No.154.

1    With respect to the essential element for standing that Plaintiffs' telephone calls to GC Services

2    were actually monitored or recorded, they offer only their suspicions.  GC Services substantiates it

3    records no debt collection conversations and does not have the technical capability for such recording

4    at its California locations, and it "never monitored any of its telephone communications with the

5    Thomassons," with evidence identifying the telephone equipment at its California locations as well

6    as monitoring records it was ordered to produce in the course of this litigation.  Mot. 24:21-22.  In

7    particular, the magistrate judge had ordered GC Services to provide the name, address and phone

8    numbers of the approximate 200 individuals whose telephone calls had been monitored.  Dkt No. 58.

9    "Neither Andrew nor Rebecca Thomasson was on the list."  Mot. 24:20, citing Exh. 7 at 15.  On that

10   basis, GC Services contends:  "There is a complete evidentiary failure to support their individual

11   claims and, absent some real factual support, plaintiffs' 'beliefs' do not suffice to defeat summary

12   judgment." Mot. 24:22-25:2, *citing, iter alia,*  FTC v. Publishing Clearing House, Inc., 104 F.3d 1168,

13   1171 (9th Cir. 1997) (a "conclusory, self-serving affidavit, lacking detailed facts and any supporting

14   evidence, is insufficient to create a genuine issue of material fact").

15   GC Services represents Ms. Thomasson could not have had a conversation with one of its

16   representatives about the Telecheck consumer debt by calling the number in her written notice.  She

17   verifies defendant's representation through her testimony she had to call GC Services at a different

18   number to by pass the voice mail system because she received no response to the voice mail she left

19   at the number provided in her written notice.  GC Services describes the nature and conduct of its

20   collection services for its Telecheck client:

21   > GC Services sent her a letter in January 2005, indicating a $25.00 debt
   > on a Telecheck account.  Wojcicki Declaration at ¶ 6.  GC Services'
22   > work for Telecheck is "mail order" only, meaning that GC Services
   > only sends letters for Telecheck and does not attempt to collect
23   > Telecheck debts by telephone *Id.*  These letters provide a telephone
   > number to a voicemail box maintained in Houston, Texas.  *Id.*; Exhibit
24   > 7 at 15.  The Houston voicemail box invites callers to leave a message.
   > Wojcicki Declaration at ¶ 6; Exhibit 7 at 15.  GC Services listens to
25   > these recorded messages, but does not place or receive telephone calls
   > to or from Telecheck account debtors.  Wojcicki Declaration at ¶ 6
26
   Mot. 6:12-7:1.
27
28   The Motion attempts to discredit Ms. Thomasson's representations she spoke with a GC

Services representative about the Telecheck debt:

- 15 -                                              05cv0940

> Both of the Thomassons claim to have talked on the telephone with GC Services about an alleged consumer debt. [FAC ¶¶ 24, 30-31]. But GC Services' records show that Rebecca Thomasson never had a conversation with a GC Services Representative. Exhibit 7 at 15.. . . . Of the five pages of documents that plaintiffs produced in this litigation, none relate to Rebecca Thomasson. Declaration of John H. L'Estrange Jr., dated September 28, 2006 at ¶ 12. Rebecca Thomasson has no evidence that she ever talked to GC Services on the telephone, let alone that GC Services recorded or monitored a conversation with her.

Mot. 6:12-7:1.

The parties thus dispute whether Ms. Thomasson ever spoke with a GC Services representative when she placed her calls. However, her sworn testimony is adequate evidence the court must accept on summary judgment to support her contention she spoke with GC Services representatives in January and February 2005 by using a different number.[18]  She represents her July 2005 call was simply to verify her account was cleared after she paid the amount owing and to ascertain the status of Mr. Thomassons' MCI account.  Nevertheless, Plaintiffs have produced no evidence to substantiate their allegations they have standing to represent a class of all persons whose calls **were recorded/monitored/eavesdropped upon**, consisting of "all persons who engaged in at least one telephone conversation with a person employed by Defendant GC SERVICES participating therein and **who have had said conversation** with a GC SERVICES employee **recorded and/or monitored and/or eaves dropped upon**." FAC ¶ 41; *see also* FAC ¶¶ 45, 59.  A plaintiff's personal interest in the litigation must exist at the beginning of the litigation (standing) and must continue throughout the entire course of the litigation to avoid mootness. *See* Cook Inlet Treaty Tribes v. Shalala, 166 F.3d 986, 989 (9th Cir. 1999), *quoting* U.S. Parole Comm'n v. Geraghety, 445 U.S. 388, 397 (1980). "[A]t the summary judgment level, the plaintiff must 'set forth' by affidavit or other evidence 'specific facts,'" including a showing of standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citation omitted.  A party bearing the burden of proof on an issue cannot rely on mere speculation, unsubstantiated beliefs, conclusory representations, or other representations lacking an evidentiary

---

[18]   However, allegations and testimony with respect to Mr. Thomasson's claims suggest he had no contact with GC Services before April 2005, about two months after Ms. Thomasson represents she placed her January and February calls to GC Services using a number he gave her.  If that is believed by a fact-finder, he could not have given her a telephone number to bypass the Telecheck voicemail call-back in connection with her January and February 2005 calls.

1    foundation adequate to raise a triable issue of material fact that requires resolution by a fact finder.

2    More than a "scintilla" of evidence is required to create a reasonable inference that could support a

3    result in  plaintiffs' favor.  Anderson, 477 U.S. at 252, 256 (the non-moving party cannot oppose a

4    properly supported summary judgment motion by "rest[ing] on mere allegations or denials in his

5    pleadings").  From the record presented, as to themselves personally or as putative class representatives

6    for others whose calls were monitored or recorded, these plaintiffs have failed to go beyond their own

7    "conclusory allegations unsupported by factual data to create an issue of material fact," Id.  The court

8    finds they have not carried their burden to successfully oppose summary judgment on that essential

9    component element of their claims.  On that basis alone, summary judgment on jurisdictional grounds

10   is warranted in favor of GC Services.

11       Moreover, even if a reviewing court were to find these named plaintiffs have standing to pursue

12   this action on their own behalf and as class representatives, for the reasons discussed below, the court

13   would **GRANT** summary judgment for GC Services.

14   **C.      Evidentiary Objections**

15           **1.      Defendant's Evidence**

16       The parties have filed most of their evidence and points and authorities "under seal."  In

17   support of its Motion, GC Services provides, as authenticated by John H. L'Estrange, Esq.:

18           Exh. 1:  Wojcicki Deposition Excerpts

19           Exh. 2:  McFarlane Deposition Excerpts

20           Exh. 3:  Stevens Deposition Excerpts

21           Exh. 4:  Macias Deposition Excerpts

22           Exh. 5:  Andrew Thomasson Deposition Excerpts

23           Exh. 6:  GC Services Answers to plaintiffs' First Set of Interrogatories

24           Exh. 7:  GC Services Supplemental Responses to plaintiffs' First Set of Interrogatories

25           Exh. 8:  Documents Produced by GC Services Bates numbered GC04621-GC04629 and

26               GC04630-GC04664.

27           Exhs 9 - Exh. 11:  CPUC's tariffs for GTE West Coast, Inc., Pacific Bell, and SBC California

28           Exh. 12: California Public Utilities Commission's General Order 107-B.

GC Services filed additional Exhibits in support of its Reply to plaintiff's Motion Opposition, authenticated by John H. L'Estrange, Jr.  They are:

Exh. 13:  Bond Deposition Excerpts.

Exh. 14:  Undated letter from Robert E. Schroth, Jr., produced at the deposition of plaintiff Andrew Thomasson in response to an Order from the Magistrate Judge that plaintiffs turn over to GC Services the letter they sent to putative class members.

Exh. 15: A July 19, 2006 letter from defense counsel to plaintiff's counsel.

Exh. 16:  Rebecca Thomasson's Answers to GC Services Second Set of Interrogatories.

Exh. 17: Plaintiffs' Objections and Responses to GC Services' Second Request For Production of Documents.

Exh. 18:  A November 9, 2006 letter from plaintiffs' counsel to defense counsel which Mr. L'Estrange declares had third-party declarations attached that were later used by plaintiffs as part of their Opposition to the Motion For Class Certification.  L'Estrange Decl. ¶ 13,

Exh. 19: A compilation "showing certain statements made in plaintiffs' memorandum in opposition to the motion for summary judgment, the corresponding fact cite, and a summary showing the actual statement of fact in the fact cite."  L'Estrange Decl. ¶ 14,

**2.    Plaintiffs' Objections To Defendant's Evidence**[19]

Objection No. 1:  GC Services filed the Declaration of Dennis Wojcicki and his Amended Declaration in support of the Motion.  Mr. Wojcicki identifies himself as Senior Vice President of GC Services and a GC Services employee since 1983 with personal knowledge of the conduct of GC Services business activities and of the company's contact with Rebecca Thomasson by mail seeking to collect a $25.00 debt on a Telecheck account.  Wojcicki Amended Decl.[20]  Plaintiffs move to strike

---

[19]   Plaintiffs objected  to evidence GC Services submits in support of its Motion, then slipped in another round of commentary by "responding" to defendant's Opposition to Objections to evidence and Additional Objections along with its Opposition to Objections to Plaintiff's evidence.  Dkt No. 170.  The supplemental responses were not authorized, and are simply redundant of the original objections.

[20]   The Amended Declaration appears to differ from the Declaration only in deletion from ¶ 1 of the language "information, and belief" following the phrase "based on my personal knowledge."  The court accordingly considers only the Wojcicki Amended Declaration.

1   the Wojcicki Declaration on grounds the original Declaration included the phrase based on

2   "information and belief," and only personal knowledge averments qualify as admissible evidence

3   adequate to support summary judgment.  The defect was cured by the filing of the Amended Wojcicki

4   Declaration.[21]  Accordingly, the Objection is **OVERRULED** as moot.

5          Objection No. 2 - No. 4:  Challenges to Mr. Wojcicki's personal knowledge of third-party debt

6   collection clients' time spent attempting to collect delinquent accounts before referring them to GC

7   Services, his personal knowledge of who the local and long-distance carriers are in San Diego, and his

8   personal knowledge of the type of business telephone system and how it operates in GC Services'

9   California call centers.  Mr. Wojcicki testifies he has been with GC Services for well over twenty years

10  and currently holds a senior position with the company.  The futility of insisting that he describe in his

11  Declaration how he came to have personal knowledge, for example, of the type of phone system in use

12  in the relevant market is shown by the parties' listing as an Undisputed Fact that GC Services'

13  California call centers utilize Nortel's "Meridian I" telephone system, the very testimony he provides

14  in his Declaration.  The Objections are **OVERRULED**.  Mr. Wojciki's familiarity with those technical

15  aspects of the telephone services and monitoring devices is adequately supported by his averments and,

16  in addition, information such as which companies provide telephone services in this area do not appear

17  to be disputed nor are they material to this ruling.

18         Objection No. 5:  Motion to strike paragraph 2 of the L'Estrange Declaration, including

19  associated exhibits and any arguments based thereon, wherein he authenticates as "true and correct"

20  copies of selected pages from the Wojcicki Deposition, on grounds he is not competent to authenticate

21  a deposition or deposition extract in a summary judgment motion absent the reporter's certification

22  page.[22]  Plaintiffs argue attorney L'Estrange was not present for that deposition, so the exhibit excerpts

23

24        [21]  Plaintiffs urge the court to reject the "new" evidence "without affording plaintiffs an opportunity
    to respond," whereas the substance of the "new" declaration is the same as the old.
25

26        [22]  Plaintiffs argue in supplemental response that GC Services should be held to the evidence as
    presented in support of the Motion (*i.e.*, lacking the certification) and the deposition transcripts should be
27  ignored by the court because they were initially "incomplete as a result of its failure to abide by the rules of
    procedure and evidence."  They argue the "were not required to rebut evidence which did not technically exist
    as part of the record at the time of their opposition," a hyper-technical argument which makes short shrift of
28  an opposing party's burden in opposing a summary judgment motion, where the moving party is not required
    to produce any evidence on an issue where the non-moving party bears the burden of proof. Dkt No. 170 3:18-

1   "lacks foundation, authenticity, and fails as hearsay."  Pl. Obj. To Evid. 5:14-6:3.  The "form over

2   substance" of plaintiffs' objection is highlighted in GC Services' response:

> Plaintiffs themselves have authenticated the exact same transcript by
> including the reporter's certification.  *See* Exhibit A to the Declaration
> of Robert L. Arleo.  A writing may be authenticated by evidence that
> the party against whom it was offered admitted its authenticity.  Orr v.
> Bank of America, 285 F.3d 764, 776 (9th Cir. 2002).

6   Resp. To Pl. Evid'ry Obj.13:24-14:4.  The Objection is **OVERRULED**.

7           Objection No. 6: Objection and Motion To Strike Mr. Wojcicki's deposition testimony at page

8   150 line 19 through page 151 line 8 (attached as "Exhibit 1" to the L'Estrange Declaration), and any

9   argument based thereon.  Those portions of the deposition show Mr. Wojcicki answered "Yes" to the

10  questions whether GC Services employees are advised to tell persons who are engaged in telephone

11  conversations with them that the call could be monitored and whether they give that advisement.

12  Plaintiffs argue the deponent lacks personal knowledge because Mr. Wojcicki's testimony and the GC

13  Services website indicate GC Services employees more than 10,000 people, so there is "simply no way

14  Mr. Wojcicki could possibly know what each collector does day to day," and he also testified he

15  "rarely, if ever, visited the three collection sites in California." Pl. Evid'ry Obj. 6:26-7:5.  GC Services

16  argues Mr. Wojcicki, as a senior vice president of the company, has knowledge and competency to

17  provide testimony regarding the company's policies, including that GC Services employees are

18  instructed to give the call monitoring advisement, and that knowledge and competency may be inferred

19  from his position and tenure with the company.   Resp. To Pl's Evid'ry Obj. 14:13-16, *citing*

20  Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990) (finding "[t]hat Rule 56(e)'s

21  requirements of personal knowledge and competence to testify" were met as "may be inferred from

22  the affidavits themselves" by virtue of the persons' positions and participation in the matters "to which

23  they swore").  The Objection is **OVERRULED** with respect to the competency of Mr. Wojcicki's

24  testimony that GC Services employees are instructed to tell persons who are engaged in telephone

25  conversations with them that the call could be monitored, particularly as those issues are further

26  substantiated by other declarations provided by direct supervisors or quality control call monitors with

27

28  28, 5:3-6:14, 6:17-7:11.  Plaintiffs stop short of actually challenging the substantive authenticity of the
    deposition transcript.

direct knowledge and experience with the company's advisement implementation practices, including Jeffrey Bond, a former GC Services employee whose testimony Plaintiffs heavily rely on.

Objection No. 7:  Objection and motion to strike the selected pages and argument relying on those excerpts of the McFarlane Deposition provided as an exhibit to the L'Estrange Declaration, on the same technical grounds as plaintiffs' Objection to the Wojcicki deposition excerpts purportedly authenticated by Mr. L'Estrange.  For the same reasons as Objection No. 5 is overruled, this Objection is **OVERRULED**.  In addition, GC Services cures the alleged evidentiary defect by resubmitting the same pages from the McFarlane deposition with the court reporter's certification.

Objection No. 8:  The same technical objections with respect to the excerpts of the Stevens deposition attached to the L'Estrange Declaration are **OVERRULED** for the same reasons.

Objection No. 10 (no Objection No. 9 is listed in plaintiffs' filing):  The same technical objections with respect to the excerpts of the Macias deposition attached to the L'Estrange Declaration are **OVERRULED** for the same reasons.

Objection No. 11:  Plaintiffs object and move to strike the L'Estrange Declaration paragraph nine, with associated exhibits and any argument based thereon, on grounds:  the document exhibits referenced there, produced by GC Services during discovery, lack foundation; Mr. L'Estrange has not demonstrated he has personal knowledge of the contents of the documents, chain of custody, or other indices they are ordinary course of business records, so they lack authentication; and they are hearsay as to Mr. L'Estrange.  GC Services remedies the authentication issue by providing a Reply Declaration of Dennis Wojcicki, curing the omissions.  The Objections are accordingly **OVERRULED**.

Objection No. 12:  Objection and motion to strike the L'Estrange Declaration paragraph ten, with associated exhibits and any argument based thereon, which recites Exhibits 9, 10, and 11 are true and correct copies of the CPUC's tariffs for GTE West Coast, Inc, Pacific Bell, and SBC California, on grounds of lack of foundation, lack of personal knowledge of the declarant, no demonstration of chain of custody or ordinary course of business documentary authenticity, and hearsay as to Mr. L'Estrange.  GC Services responds the documents are public records relating to the CPUC and require no additional foundation on grounds of lack of personal knowledge, relying on FRE 902(4).  *See* United States v. Simmons, 476 F.2d 33, 36 n.3 (9th Cir. 1973).  In the Reply L'Estrange Declaration,

they provide as Exhibits 9. 10, and 11 certified copies of the CPUC documents initially provided as Exhibits 9, 10, and 11 to the Motion L'Estrange Declaration.  The Objection is **OVERRULED** for that reason.[23]  Moreover, the court does not rely on that evidence in deciding the Motion.

### 3.    **Plaintiffs' Evidence**

In support of its Opposition, plaintiffs filed, as authenticated by Robert L. Arleo, Esq.:

Exh. A:  Wojcicki Deposition Excerpts.

Exh. B:  McFarlane Deposition Excerpts.

Exh. C:  Swain Deposition Excerpts.

Exh. D:  MacDonald Deposition Excerpts.

Exh. E:  Andarde Deposition Excerpts.

Exh. F:  Macias Deposition Excerpts.

Exh. G:  Stevens Deposition Excerpts.

Exh. H:  Ruling in *Cali v. Asset Acceptance Corp.*, Case No. 2:05cv04858-JS-AKT (Sybert, J.)(E.D.N.Y. Sept. 15, 2006) (described in Arleo Decl. ¶ 11 as ruling "the Plaintiff had stated a valid claim for relief under 15 U.S.C. § 1692e by alleging that the Defendant's failure to advise consumers that their telephone calls may be monitored or recorded was false and deceptive conduct in an attempt to collect a debt").[24]

Mr. Arleo also represents:  "During this litigation, GC Services *has not produced a single document that shows*[:]  the telephone conversations between Andrew Thomasson and Rebecca Thomasson and GC Services *were not* monitored or recorded by the Defendant's employees[;] . . . Andrew Thomasson and Rebecca Thomasson were ever advised that their telephone conversations

_____

[23]  In a fashion emblematic of the multiplication of proceedings and filings that has characterized this case, plaintiffs take the liberty of responding to GC Services' Opposition to their evidentiary objections, then purport to treat themselves to another round of briefing by joining in that unauthorized filing "*Additional Objections* To Evidence Submitted In Support Of GC Services' Motion For Summary Judgment." Dkt No. 170. The court  rejects the eight pages of argument plaintiffs present in order to have the last word.  Dkt No. 170, pp. 1-9.  To the extent Plaintiffs object to GC Services' provision of curative declarations or evidence to satisfy their hyper-technical objections, Plaintiffs' objections are **OVERRULED**.

[24]  The court finds no authoritative value in unpublished opinions of district courts in New York, even those in which the same plaintiffs' attorney as in this case participated, particularly when the procedural posture of the case is dissimilar.

1    with GC Services might be monitored or recorded for any reason[;][25] [or] any witnesses or documents

2    that have anything to do with their MCI or Telecheck accounts, and it has instead largely relied on

3    evidence from its Los Angeles Superior Court operations having nothing to do with either of the

4    Plaintiffs' claims in this case." Arleo Decl. ¶ 10 (emphasis added).  However, that argument reverses

5    the burden with respect to Plaintiffs' obligations in opposing summary judgment.  Plaintiffs have the

6    burden of proof at trial for each alleged cause of action.  The moving party need only signal the

7    absence of evidence to support the non-moving party's claims.  Anderson, 477 U.S. at 256.  Plaintiffs

8    have the burden of production beyond the pleadings to raise a triable issue of fact when challenged on

9    summary judgment.  Reese, 208 F.3d at 738; Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249.

10         Plaintiffs filed excerpts from the Andrew Thomasson Deposition, authenticated as Exhibit A

11   to the Robert E. Schroth, Sr., Esq. declaration. They also filed exhibits authenticated by Robert E.

12   Schroth, Jr., Esq.:

13         Exh. A:  Rebecca Thomasson Deposition Excerpts.

14         Exh. B:  Jeffrey Bond Deposition Excerpts.

15         Exh. C:  GC Services' responses to plaintiffs' First Set of Interrogatories.

16         Exh. D:  GC Services' responses to plaintiffs' First Set of Requests For Admissions.

17         Exh. E:  GC Services Objections and Responses to plaintiffs' First Set of Requests For

18               Production of Documents.[26]

19         Exh. F: GC Services' Supplemental Responses to plaintiffs' Interrogatory No. 20 and plaintiffs'

20               Request for Document No. 17, identified as "GC35716-GC35727" identifying "several

21               of the putative class members as defined in Plaintiffs' First Amended Complaint"

22               (Schroth, Jr. Decl. ¶ 8).

23         Exh. G:  GC Services supplemental responses to certain of plaintiffs' interrogatories.

24

25         [25]   Counsel's representation neither named plaintiff was "ever advised of the potential for call
     monitoring" is recklessly at odds with the evidence, including Plaintiffs' own testimony.  Both Mr. Thomasson
26   and Ms. Thomasson admit they had actual knowledge from their first conversation with a GC Services
     employee of the possible monitoring of their calls.  Moreover, it is unreasonable to suppose any record would
27   be kept of the *non*-monitoring or *non*-recording of particular communications.

28         [26]   Schroth, Jr.'s Declaration erroneously describes his Exhibit D and his Exhibit E as responses to
     Requests For Admissions.

Exh. H: GC Services' supplemental responses to certain of plaintiffs' Requests for Admissions. Material portions of the texts of each of eighteen Declarations from purported members of the putative class, provided in support of Plaintiffs' Opposition, are virtually identical:

Exh. I:  Declaration of Luis E. Albarracin (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[27]

Exh. J:  Declaration of Torey Amici (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[28]

Exh. K:  Declaration of Gary A. Beck (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[29]

Exh. L: Declaration of Dana Cater (whose husband was identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[30]

Exh. M:  Declaration of James E. Donelson (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[31]

Exh. N:  Declaration of Stacey Gonzales (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion. Her Declaration was executed in Sacramento, California

Exh. O:  Declaration of Amy Greenberg (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[32]

Exh. P:  Declaration of Linda Harris (identified by GC Services as a member of the

---

[27]   However, Mr. Albarracin executed his Declaration in Florida and establishes no connection to California, marginalizing any probative value to the pared-down scope of this litigation and necessary narrowing of the putative class.

[28]   Ms. Amici's Declaration was executed in Florida. *See* fn 11, above.

[29]   Mr. Becks' Declaration was executed in Montana. *See* fn 11, above.

[30]   Ms. Cater's Declaration was executed in Louisiana. *See* fn 11, above.

[31]   Mr. Donelson's Declaration was executed in Texas. *See* fn 11, above.

[32]   Ms. Greenberg's Declaration was executed in New York. *See* fn 11, above.

putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[33]

Exh. Q:  Declaration of Carlyn L. Cowan-Holzworth (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[34]

Exh. R:  Declaration of Anna Jenkins, identified in the Schroth, Jr. Declaration as a person having had "telephone communications with GC Services's office located in Los Angeles, California since the filing of Plaintiffs' complaint regarding an alleged consumer debt that was monitored by the Defendant" without defendant or its employees "ever advis[ing her] that her telephone conversations with the Defendant might be monitored and/or recorded, and Ms. Jenkins never consented to having her communications monitored or recorded by the Defendant and its employees." Schroth, Jr. Decl. ¶ 20.  Ms. Jenkins executed her Declaration in San Jose, California.

Exh. S:  Declaration of Bonnie W. Langdon (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[35]

Exh. T:  Declaration of Ted Odenthal(identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[36]

Exh. U:  Declaration of Melissa K. Peppel (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[37]

Exh. V:  Declaration of Monica Rojas (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.  Ms. Rojas' Declaration was executed in San Diego, California.

Exh. W:  Declaration of Russell Roman (identified by GC Services as a member of the putative

---

[33]  Ms. Harris' Declaration was executed in Nebraska.  *See* fn 11, above.

[34]  Ms. Cowan-Holzworth's Declaration was executed in Alaska.  *See* fn 11, above.

[35]  Ms. Langdon's Declaration was executed in North Carolina.  *See* fn 11, above.

[36]  Mr. Odenthal's Declaration was executed in Virginia.  *See* fn 11, above.

[37]  Ms. Peppel's Declaration was executed in South Dakota.  *See* fn 11, above.

05cv0940

class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[38]

Exh. X:  Declaration of Carla Venezia (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.  Ms. Venezia's Declaration was executed in Palos Verdes Estates, California.

Exh. Y:  Declaration of Jill Walton (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[39]

Exh. Z:  Declaration of Thomas Wood (identified by GC Services as a member of the putative class defined in the FAC) in support of plaintiffs' Opposition to the Motion.[40]

### 4.   Defendant's Objections To Plaintiffs' Evidence

GC Services filed under seal Objections to plaintiff's Opposition evidence.[41]  In particular:

Objection No.1:  Defendant objects to the Robert E. Schroth, Jr. Declaration, paragraphs 11 through 28, where he purports to authenticate and characterize 18 third-party witness declarations, on grounds his statements in those paragraphs "are argument, not evidence, and therefore not relevant" (Def.'s Evid. Obj. 1:7-2:1), where Mr. Schroth states:  "The Defendant admits in its [supplemental responses to interrogatories and admissions] that it monitored and/or recorded at least one of [name of consumer] telephone conversations. . . ."  The Objection is **SUSTAINED** to the extent Mr. Schroth's affidavit purports to characterize or interpret the evidence of GC Services' discovery responses. The discovery responses themselves are the evidence.  For example, in response to Plaintiffs' Interrogatory No. 6, GC Services states "it does not record telephone conversations it conducts with alleged debtors in California." Schroth, Jr. Exh. C, 7:9-10.  To the extent the Schroth Declaration suggests otherwise, it must be disregarded because counsel's argument has no evidentiary value on the merits.

---

[38]   Mr. Roman's Declaration was executed in Massachusetts.  *See* fn 11, above.

[39]   Ms. Walton's Declaration was executed in New Mexico.  *See* fn 11, above.

[40]   Mr. Wood's Declaration was executed in Utah.  *See* fn 11, above.

[41]   GC Services also combined with its Objections to plaintiff's evidence a section responding to Plaintiffs' objections to its evidence in support of the Motion.  Like Plaintiffs responses to GC Services' evidentiary objections, the supplemental argument was not authorized, and it is largely redundant of the original evidentiary objections.

Objection No. 2:  GC Services asks the court to reject all 18 third-party Declarations provided in support of Plaintiffs' opposition.  Each purports to be from an individual consumer who allegedly had telephone conversations with GC Services debt collection representatives and was not given an advisement their respective calls might be monitored.  GC Services raises multiple objections to this evidence, including:  the use of stock paragraphs, repeated verbatim in most of the other declarations and with only minor variations in others; the declarants allude to a list of consumer names GC Services allegedly provided of persons whose monitored calls were made from or received by GC Services' California Offices in a document that was marked "Confidential-Attorneys' Eyes Only," so the declarant either lacks foundation for that statement, or a breach of the Protective Order occurred; several remarks in the declarations are not relevant to any claim in the lawsuit (*e.g.*, how the declarant learned of the lawsuit and motivation for providing a declaration); whether the declarant was given an advisement the call might be monitored is not relevant to whether the calls between GC Services and the putative class representative plaintiffs were monitored or whether the plaintiffs were given an advisement).  GC Services also argues the declarations are inherently unbelievable because of their form language.  However, the court declines to make credibility findings with respect to the believability of the factual merits of the third party witnesses' declarations, and those objections are **OVERRULED**,

Plaintiffs refute the objections to the 18 declarations on grounds they are relevant as evidence of GC Services' practice regarding call monitoring and recording advisements. The recording advisement issue is irrelevant to the remaining claims in this case.  However, the monitoring issue remains, and Defendant's objection on relevance grounds are **OVERRULED** and motion to strike pertinent parts is **DENIED**.

Objection No. 3:  GC Services objects that the Arleo Declaration is argumentative and mischaracterizes the Order in *Cali v. Asset Acceptance LLC* in his paragraph 11.  He attached the Cali opinion as Exhibit H to his Declaration.[42]  To the extent the court would consider that case for any

---

[42]  Plaintiffs rely on one case from this district and one case from a district court in New York for their argument intentional failure to give an advisement to consumers so they "will mistaken believe they are not being monitored or recorded" constitutes an FDCPA violation. Opp. 16:25-17:4. Both cases are factually and procedurally distinguishable from this one.  In Gibson v. Penn Credit Corp., S.D. Cal. Case No. 05cv1736-

1  purpose, the court determines for itself the persuasiveness of its legal import as well as its scope,

2  irrespective of Mr. Arleo's characterizations.

3         Objection No. 4:  GC Services objects to portions of the deposition of Jeffrey Bond, provided

4  as Exhibit B to the Schroth, Jr. Declaration on grounds most of the offered testimony is not relevant

5  to the claims in this action and should be stricken.

6         Mr. Bond testified about many aspects of GC Services' business that are
          unique to specific clients and not relevant to the claims in this action.
7         According to Mr. Bond, those practices included first party teleservices
          work and call monitoring by GC Services for the Los Angeles Times
8         newspaper and debt collection work for Providian Bank that ended in
          November 2003.  Plaintiffs in this case are complaining about GC
9         Services practices after May 4, 2004, that relate to GC Services' clients
          MCI and Telecheck (FAC ¶¶ 21 (MCI), 29 (Telecheck) and 42 (class
10        period is one year prior to May 4, 2005)).

11 Def.'s Obj. To Evid. p. 11.

12        For those reasons, and with respect to consideration of those portions of the Bond testimony

13 for purposes of deciding this Motion, the Objections are **SUSTAINED**.  The court also **GRANTS** the

14 "alternative" request under FRE 106 that the court admit additional portions of the Bond deposition

15 ───────────────────

16 H(CAB), the district judge granted in part and denied in part **a Rule 12(b)(6) motion to dismiss** a putative
   class action FDCPA claim arising from defendant's repeated automated telephone calls to the plaintiff asking
17 plaintiff to call an 800 number regarding the collection of an alleged debt owed by a person whose name
   plaintiff did not know.  He called the 800 number approximately 10 times to request his telephone number be
18 removed from defendant's call list and spoke to various employees who assured him his number would be
   removed from their call list. Plaintiff alleged that during two of those calls, the collector's employees subjected
19 him to vulgar language.  During his final conversation with a company supervisor, after he inquired, plaintiff
   was told **the conversation was being recorded and that *it was the debt collector's policy to record all such
20 conversations***.  The district judge  found on those facts plaintiff met his burden to state a set of facts that could
   entitle him to relief under the FDCPA.  Gibson, Dkt No. 9.  Those facts are wholly distinguishable from the
21 facts of this case, where GC Services never contacted these plaintiffs again after the initial mailings simply
   alerting them to a reported debt, and Rule 12(b)(6) standards are wholly distinguishable from Rule 56 standards
22 of review.  In Cali v. Asset Acceptance Corp., a case from the Eastern District of New York, provided as
   Exhibit H to the Arelo Declaration, the district court denied **a motion for judgment on the pleadings** of
23 plaintiff's claim the debt collector's **policy of recording telephone conversations** without informing the
   consumer at all or only near the end of the conversations in the collection of debts violated the FDCPA.  Again,
24 the non-binding opinion of that court was that the non-disclosure of ***the recording*** of telephone conversations
   "loosely satisfied" the definition of "deceptive" communication.  Plaintiffs produce no evidence GC Services
25 recorded any conversation with either of them or with any similarly situated person they could have standing
   to represent in this action.  Like the Gibson case Cali cites, the Cali court found plaintiff "marginally" stated
26 a claim, and the court was hesitant to grant judgment on the pleadings.  Here, the parties have had the
   opportunity to develop and present an evidentiary record.  The procedural posture of this case is distinguishable
27 from those.  Moreover, Plaintiffs do not demonstrate they were misled into disclosing more (or any) financial
   information than they would have had they known  of the possibility another GC Services employee might be
28 monitoring the call by listening in, so any "deception" or "falsity" or "misleading" inference loses any force
   on so speculative a basis.

1   addressing monitoring and recording and advisements he personally observed insofar as they include

2   germane observations he made on those questions not limited to the GC Services contractual work for

3   the Providian Bank and the Los Angeles Times, two GC Services clients whose service contracts are

4   unrelated to the claims of these plaintiffs associated with the company's debt collection agreements

5   with MCI and Telecheck.

6        Objection No. 5:  GC Services contends Exhibit A to the FAC purporting to be a print of a GC

7   Services website page has not been authenticated and should not be considered by the court.  The

8   objection is **SUSTAINED**.

9        **D.      Summary Judgment Is Warranted**

10        Rather than run to ground the frequently extraneous arguments in Plaintiffs' Opposition, the

11   court attempts to extract those directly bearing on and dispositive of the merits of the Motion, in

12   consideration of Plaintiffs' own articulations of the basis for their claims as extracted above.  Among

13   other things, the court disregards those GC Services business practices Plaintiffs criticize but which

14   are unrelated to their own circumstances or the particular type of debt collection service GC Services

15   provides for its MCI or Telecheck clients alleged in the FAC as giving rise to their specific claims.

16        **1.      Evidence Of Call Monitoring Practices**

17        The FAC pleads a "policy and practice" of undisclosed recording and monitoring of telephone

18   communications initiated or accepted by GC services (FAC ¶ 40), whereas the testimony of Jeffrey

19   Bond, a former GC Services collection manager who left GC Services employ in February 2004,  as

20   well as the testimony of several other GC Services employees, actually substantiates company policy

21   is to advise consumers of the potential for call monitoring.   Bond Depo. 27:13-14.  Bond testified GC

22   Services monitors calls for quality control and training purposes and trains employees like himself

23   regarding disclosure issues.  Bond Depo. 22:20-22, 138:15-18.  He testified that he, "like every other

24   collection manager that plaintiffs deposed in this case" (Reply 7:17-19), would interrupt a call and

25   demand the advisement be given if he heard a collector fail to give the call monitoring disclosure.

26   Bond Depo. 57:21-58:2.  He also testified he never witnessed any GC Services employee recording

27   a call, and no recording equipment is on site at the GC Services facility where he worked.  Bond Depo.

28   20:14-17, 19:4-6; *see* Reply 7:20-22..

In its Opposition to summary adjudication of the FDCPA claim, Plaintiffs rely primarily on argument and counsel's summaries of portions of the Bond testimony, referring the court to prior sections of the Opposition but without citation to readily accessible portions of that evidentiary record. The court is under no obligation to "scour the record in search of a genuine issue of triable fact" (Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)), nor need it "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could be conveniently found" (Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001)).  For example, Plaintiffs summarily contend:

> Mr. Bond testified that monitoring by the Defendant is not always done for the purpose of quality assurance.  Bond also testified GC Services knows that a substantial number of consumers will not acquiesce to sharing their personal and private information while having their telephone calls monitored or recorded.  **That is the reasons GC Services chooses not to provide the advisement to consumers**.

Opp. 16:12-16 (emphasis added).

Turning from argument to evidence, Mr. Bond actually testified he worked as a supervisor from GC Services' Irwindale facility.  Leaving aside the issue of recorded phone calls, a process that the evidence conclusively establishes does not occur in GC Services' California debt collection facilities (as discussed below),[43] Mr. Bond's testimony corroborates the testimony of other GC Services managers about company policy to give notice regarding possible call monitoring for quality control:

> Q.  When you were monitoring a telephone call between a collector and a consumer, and if, for example, you heard the collector say something that was inappropriate or he had forgot [sic] to give **the mini-Miranda** or something like that, was it your practice to interrupt a collector and have him take corrective action?
>
> A.  Yes.
>
> Q.  How did you alert the collector that he should put the call with the consumer on hold?
>
> A.  Personally I would walk up to the collector and just immediately ask them to put the call on hold so that the consumer could not hear our discussion.  I would instruct the

---

[43]  Mr. Bond himself testified he had never personally observed a GC Services manager record a telephone call between a collector and a debtor.  Bond. Depo. p. 20.  Moreover, he testified as to specific account practices, such as for GC Services client Providian , an account that was "out of" GC Services offices at the end of 2003 (see, e.g., Bond Depo. pp. 13-22), not related to the MCI or Telecheck debt collection services or practices the Thomassons place at issue.

1   collector of the scenario that just occurred to make sure that
    they understood it and gave a corrective action as long as that
2   is what it dictated me to do, and give them a suggestion on how
    to continue the call and then go from there.[44]

3

    Q.   The monitoring was used then for quality assurance; is that
4        right?

5   A.   In this particular scenario that I just gave you, yes.

6   Bond Depo. pp. 57-58 (emphasis added).[45]

7        Mr. Bond also testified GC Services trained him on the monitoring of telephone calls.

8   Q.   While you were at GC Services did you receive training
         regarding he monitoring of telephone calls?
9
    A.   Yes.
10  . . . .

11  Q.   While you were at GC services, were you tested periodically on
         the FDCPA?
12
    A.   Yes.
13  . . . .

14  Q.   And also did you have a familiarity with related state laws
         concerning debt collection practices?
15
    A.   You had -- personally myself, you were in so many different
16       states that we did the best we can with the information that was
         given to us by management on that.
17
    Q.   The test that you had periodically also covered state law; is that
18       correct?

19  A.   That is correct.
    . . . .
20
    Q.   While you were at GC Services did you ever believe that it was
21       illegal to monitor telephone calls between collectors and
         debtors?
22
    A.   No.
23

24  \\

25  ───────────────

    [44] "Q. So you had two different ways then of monitoring the phone call. One was to hit the observe
26  button on the phone, right?  A.  Correct.  Q.  And the other was to come up behind the collector with this
    portable device?  A.  Correct."  Bond Depo. p. 57.

27  [45] Mr. Bond also testified sometimes collectors would "make fun of the consumers" by putting them
    on speaker phone so "the entire office could hear them bantering back and forth."  Bond Decl. pp. 58-59.
28  "**Q. That was against GC Services policy, right?**  A.  **Yes, it was**.  Q. As a manager that is something that
    you would put a stop to if you observed it, correct?  A.  Absolutely."  Bond. Depo. p. 59 (emphasis added).

Q. Do you still have that belief as to monitoring, that it is not illegal?

A. Yes.

. . .

Q. **And it was your belief and understanding for the monitoring to be acceptable or legal you had to give the mini-Miranda**?

A. **Yes**.

Q. Was there a comparable **mini-Miranda** for recording?

A. It was usually the same sentence. . . . [¶] "The call may be monitored [or] recorded for quality assurance."

Q. Was that mini-Miranda that [sic] was given by all collectors to all debtors to both incoming and outgoing calls?

. . . .

Q. . . . The mini-Miranda that you have just stated included both monitoring and recording, right?

A [Yes].

. . .

Q. **In connection with the collectors that you supervised, was that two-part mini-Miranda that included both monitoring and recording supposed to be given to every debtor**?

A. **Yes, it was supposed to be given to every debtor**.

Q, **Was it generally given**?

A. **To the best of my knowledge**.

Q. One of your responsibilities was to make sure that it was given, right?

A. Correct.

Bond Depo. pp.22-27 (emphasis added).

Q. **In terms of the mini-Miranda, was that one of the things in the talk off[46] that you would make sure was given, and if it was not you would interrupt the collector and make sure that he did give it before he continued with the call**?

A. **On the calls we monitored, yes**.

Bond Depo. p. 59 (emphasis added).

---

[46] **"Talk off"** was defined by Bond: "A. The elements of the talk off is the script that the collector uses to make sure they are hitting the points to make it a win-win call for both the consumer and the collector. Q. **One of the elements of that is the mini-Miranda**? A. **Correct**." Bond Depo. p. 28 (emphasis added).

05cv0940

1    Q.   **All the monitoring that was done, whether it was for the
2         customer or for GC Services, was for quality assurance
         purposes; is that right**?

3    A.   **As far as I know**.

4  Bond Depo. p. 138 (emphasis added).

5      Despite that policy, Mr. Bond testified he saw one manager falsify call monitoring review

6  sheets, although it is not clear whether those sheets were prepared for a particular GC Services client

7  with particular contractual variations from standard debt collection practices such as those associated

8  with accounts like MCI and Telecheck. Mr. Bond identified Providian, Dish Network, and L.A. Times

9  as GC Services clients **who engaged GC *Services for the purpose of monitoring phone calls* with**

10 **clients' customers**.   That is not conduct associated with GC Services' debt collection practices

11 implicated in this case.   The only relevant evidence for purposes of this litigation involves GC

12 Services' practices with respect to its debt collection services for clients such as MCI and Telecheck,

13 not its call monitoring for quality control of *its clients' workers* or other special purpose services.[47]

14 The issues in this litigation relate to practices of GC Services supervisors to randomly monitor the

15 conversations of its own workers with putative debtors, conduct Mr. Bond and others substantiate was

16 for internal quality control purposes and entailed application of company policy to give an advisement

17 to the consumer to satisfy privacy laws.

18      Mr. Bond also testified he observed a manager  put some consumers on speaker phone in the

19 office and making fun of them, "using them as an example, more or less."  Bond Depo. pp.103-106.

20 The thrust of his testimony about such isolated incidents of misconduct permits only one reasonable

21 inference -- those examples reflect exceptional and disapproved improprieties.  The Bond testimony,

22 and that of other GC Services supervisors, is evidence that speaks for itself.  Plaintiffs' efforts to

23 repackage it to conform to its contrary and conclusory theory regarding GC Services' call monitoring

24 policy creates no triable issue of material fact.

25 \\

26

27      [47]   "Q. Are you aware of any other clients that GC Services monitored calls for? A. With clients?
28 Q. Yes, other clients that required GC Services to monitor calls.  A. Yes, Dish Network. Dish Network, L.A.
   Times, Providian were the three that I am aware of.  It would be in the client's contract for the clients that I
   can't speak to whether that was a requirement of not."  Bond Depo. pp. 106-107.

1     The parties also rely on the deposition of Hugo Andrade, an assistant manager with GC

2   Services for two or three years, with eight debt collectors working under him.  Andrade Depo. p. 16.

3   He described his role as to train those agents, motivate and develop them with the goal of reaching

4   monthly collection goals. Id. p. 17.  He described the process for *out-going* calls placed to consumers.

5   When the person who answers the phone identifies himself as having the same name as the person

6   whose debt GC Services is trying to collect for its client, Mr. Andrade testified he immediately gives

7   his own name and states:  " 'I'm calling from GC Services.  Your call may be monitored.  I'm just

8   calling to let you know' -- and then I go into the actual [*sic*]." Id. p. 26, pp. 26-29 (describing the

9   course of typical debt collection conversations).  He testified he gives the monitoring advisement only

10  after he confirms he is actually speaking to the alleged debtor. Id. p. 28. Mr. Andarde testified he has

11  at times caught a collector falsifying the notes taken during consumer calls to add information that did

12  not occur. Id. p. 40.  As with the Bond testimony, however, no reasonable inference can be drawn

13  from such anecdotal observations of occasional *misconduct* other than as deviations from company

14  policy.

15     Another GC Services employee, Jennifer MacDonald, testified at deposition she had been a

16  unit manager for GC Services for two years with duties to train and develop a group of eight persons.

17  MacDonald Depo. pp. 18-19.  She testified she was trained to make debt collection calls:  "I had to

18  identify myself, identify the collector, **use the QMD,**[48] update information, as in address, and proceed

19  with collecting the account." MacDonald Depo. p. 13 (emphasis added).  She testified collectors had

20  to know certain information up front from the person to whom they were speaking, by verifying who

21  was on the phone, to be sure they were talking to the person they were seeking. Id. pp. 13-14.  By

22  extension, the same safeguards to ensure a person's identity would apply to calls GC Services receives

23  from persons representing they are inquiring about a debt collection effort directed to themselves

24  before GC Services employees discuss any particular financial matter, presumably information GC

25  Services has already been provided by its creditor client.  Ms. MacDonald testified such identifying

26  data included inquiring about name, license number, birth date, and address information. Id. p. 14.

27

28        [48]   Like the term "mini-Miranda," the "QMD" reference is to the call monitoring advisement GC
Services collectors are trained to give in the course of their communications with consumers. *See* McFarlane
Depo. pp. 38-39.

1   **She testified she gives the "call may be monitored for quality assurance" advisement as soon as**

2   **the person affirms his or her identity as the intended call recipient.** Id. pp. 17-18.

3        Ms. MacDonald also testified as a unit manager, she monitors her group's phone calls.

4   MacDonald Depo.  p. 19.  She acknowledged the two methods of call supervision also identified by

5   Mr. Bond: one where the manager actually listens in on a two-way conversation between the alleged

6   debtor and one of the GC Services collectors under her, and a second when the manager stands behind

7   the collector and only listens to the collector.  Id. p. 19.  She testified she does not consider standing

8   behind the collector to be "monitoring" a phone call.  Her understanding of "monitoring" is when she

9   listens from her desk.  Id. pp. 19-20.

10          Q.     Okay.   And when you're listening to that telephone
               conversation, what are you listening for?

11

12          A.     **Proper customer service, introduction Q.M.D.**, update of
               information, address, what not; that the correct information is
               being given on an account and the correct service is being given

13               as well.

14   MacDonald Depo. p. 20 (emphasis added).

15        Ms. MacDonald testified she makes notes during her call monitoring.  MacDonald Depo. p.

16   20; *see also* Wojcicki Depo. p. 152 (the managers monitoring telephone calls take notes to evaluate

17   the calls as they listen).  Like other of the testifying employees, Ms. MacDonald attends classes GC

18   Services offers to ensure company compliance with Federal and State collection laws.[49]  MacDonald

19   Depo. p. 26.

20        The deposition testimony of Ricarco McFarlane, a GC Services debt collection services

21   manager at the Irwindale office supervising 37 employees, testified, among other things, regarding

22   collection calls and call monitoring functions.  He testified calls are not recorded.  Rather, managers

23   like himself use a special telephone, similar to the collector's phone but equipped with an "observe"

24   function only available on the managers' phones and which requires entry of a code to activate.

25

26        [49]  GC Services produces evidence it maintains procedures intended to ensure its policies comply with
   state and federal privacy and debt collection laws. Exhibit 8 to the L'Estrange Declaration is an approximately
27   40-page internal training manual entitled "Adhering to Federal and State Laws, Participant's Guide, Collection
   Excellence Level I" with a copyright notation "December 2001 Universal Training prepared exclusively for
28   GC Services."  The document recites it is the confidential and proprietary property of G. C. Services provided
   to employees as a resource for learning and performing job responsibilities.  L'Estrange Decl. Exh. 8.

| | |
|---|---|
| Q. | Okay. What are your duties as a manager? |
| A. | Well, we conduct file reviews. We handle second voices, complaint calls, train. We conduct phone monitors. . . . [and] make sure the company policies and procedures are being followed. |
| Q. | Do you listen in on telephone calls? |
| A. | Do I listen in on telephone calls? I don't listen in on telephone calls. I monitor calls. |
| Q. | What do you mean by "monitor"? |
| A. | That means for training purposes. |

. . .

| | |
|---|---|
| Q. | So you listen to calls? |
| A. | Yes. |
| Q. | Okay. And who are those calls between? |
| A. | It's between the collector and/or the consumer or defendant or debtor. |
| **Q.** | **Does the consumer  know you're listening in?** |
| **A.** | **Yes. They know that the calls may be monitored for quality assurance.** |
| **Q.** | **And who tells them that**? |
| **A.** | **The collector does**. |
| **Q.** | **Do they always tell them that**? |
| **A.** | **Always**. |
| Q. | Has there ever been a time when you listened in to a telephone call and the advisement was not given? |
| A. | No. |

. . . .

| | |
|---|---|
| **Q.** | **How is that advisement referred to? Is there a specific term that  you use by [*sic*] GC Services**? |
| **A.** | **Q.M.D.** |
| Q. | Okay. How long have you been monitoring calls? |
| A. | Roughly, nine years off and on. |

. . . .

| | |
|---|---|
| Q. | . . . So how do you know you never heard a call that did not give the Q,M.D.? |

1        A.    Usually, I would -- in a situation like that, I would jump on the call right away to intervene. . . .

2        Q.    So how would you intervene?

3        A.    I would tell the collector to put the call on hold, advise him. . . .

4        [¶]  And they would give the disclosure.

5    L'Estrange Decl. Exh. 2, pp. 40, 41, 46, pp. 37-39 (emphasis added).[50]

6          Mr. McFarlane described a typical debt collection call.  First, the collector establishes the

7    identity of the purported debtor through asking name, address, date of birth to confirm the person on

8    the phone and the alleged debtor are the same person.  L'Estrange Decl. Exh. 2, p. 57.

9        Q.    Okay.  So then after you've confirmed it's me, then what do you do?

10       A.    Then I give you the Q.M.D.

11       . . . .

12       Q.    . . . Now, verbally, tell me the words that you would use next.

13       A.    "I must inform you this call may be monitored for quality assurance."

14       . . . .

15       THE WITNESS:  We've been trained to give the quality assurance disclosure and to treat the individual, you know, respectfully,

16   professionally, follow client standards.

17   L'Estrange Decl. Exh. 2, p. 42, 44.[51]

18         Cassandra Stevens, a GC Services debt collection supervisor, described in her deposition the

19   content and process of a typical telephone call she places.  Once she ascertains she is speaking with

20   a person whose name is the same as the consumer she is trying to reach, her practice is to immediately

21   identify herself and give the advisement:

22       A.    "This is Miss Stevens calling from GC Services.  I'd like to advise that [*sic*] you that this call may be monitored for quality

23   assurance."

24       Q.    You tell them that as soon as he tells you it's John Smith?

25       A.    Yes, I do.

26

27   [50]  Mr. McFarlane was unable to provide an estimate in what number or percentage of GC Services' monitored debt collection calls the advisement is not given.  L'Estrange Decl. Exh. 2, p. 47.

28   [51]  Mr. McFarlane then elaborated the process in circumstances where GC Services places the collection call.  Plaintiffs here were never called by GC Services.

Q. Don't you have to confirm or ask him any questions to confirm that it is John Smith?

A. I do that after I mention my quality monitor assurance.
. . .

Q. Now, there are times when you have to engage in a conversation with them before you can confirm they are who they are, right?

A. Yes.

Q. Now, when that conversation's going on, that's prior to the time that you advise them that the call may be monitored or recorded -- withdrawn -- that the call may be monitored?

A. Yes.

Q. . . . Does GC Services record telephone calls?

A. No.

L'Estrange Decl. Exh. 3 pp. 52, 54.

   Ms. Stevens testified she supervises four persons, each of whom engages in an average of 30 telephonic collection conversations a day.  She was unable to say how many of those approximately 200 calls per day she monitored, although she testified that she spends about an hour in an eight-hour day listening to calls, with the rest of her time spent looking over the collectors' files to ensure their "note lines are correct so I don't have to monitor."   She only monitors if she thinks there is a problem or she thinks the collector needs supervision.  L'Estrange Decl. Exh. 3 pp. 57-59.  However, she testified even experienced callers are still periodically monitored "to make sure they are sticking to the standard talk off."  Id. p. 60.

Q. Okay.  Now, when you're listening in to the telephone conversation [as a monitor], does the debt collector know you're listening in?

A. No.

Q. How do you know that?

A. I don't know.  They don't hear -- we don't say anything.

Q. So in other words, you're listening in on that telephone conversation, and there's no way for the collector to know that you're listening?

A. No.

Q.   Is there any way for the person who's talking to the collector to know that you're listening?

A.   No.

**Q.   Okay.  Let's say during the course of that conversation you determine that the collector did not tell that person the call could be monitored.  What do you do?**

A.   **I stop them and make sure they tell them that**.

Q.    How do you stop them?

A.   I tell them to place that call on hold.

Q,   Okay.  And how will they place the call on hold?

A.   By telling them to hold.

Q.   All right.  And then you'll engage in a separate dialog with the collector?

A.   Correct.

Q.   And after the advise [*sic*] is given, are there ever circumstances where the person on the other end will not want to speak to them if the call is being listened to by somebody else?

A.   No.

L'Estrange Decl. Exh. 3, pp. 54-55 (emphasis added).

Q.   Now, you listen in to these telephone calls.  Do you ever discuss what you heard with anybody else?

A.   No.

. . . .

Q.   What were you instructed concerning disclosing that information to anyone

A.   That we're not able to discuss anything that does on with any phone calls at GC Services.

L'Estrange Decl. Exh. 3, p. 57.[52]

GC Services has produced its call monitoring records for the relevant period in response to court-ordered discovery.  The Thomassons are not among the listed consumers whose calls were monitored.

---

[52]  Mr. McFarlane also testified GC Services has a policy not to discuss monitored calls.  L'Estrange Decl. Exh. 2 p. 45; *see also* Andrade Depo. p. 40.

### 2.     First Cause Of Action

The FAC alleges as its First Cause of Action violations of the FDCPA, 15 U.S.C. § 1692e.[53] Plaintiffs rely on the provisions prohibiting the use of **false, deceptive, and misleading means** in an attempt to collect alleged consumer debts.  Plaintiffs contend the prohibition extends to not revealing "to consumers that telephone conversations with collectors might be recorded and/or monitored and/or eavesdropped upon," so that "persons engaged in these telephone conversations, . . . **may have revealed personal financial information** to debt collectors employed by Defendant GC Services *more freely*, all to the economic benefit of Defendant GC Services."  FAC ¶ 49 (emphasis added). They also rely on the FDCPA provision prohibiting the false representation of the character and legal status of alleged consumer debts, a violation of 15 U.S.C. § 1692e(2)(A).[54]  FAC ¶ 49.  Plaintiffs here raise no issue with respect to the written communications that caused them to call GC Services.

"Legislative history indicates that Congress enacted the FDCPA to protect consumers from 'improper conduct' and illegitimate collection practices 'without imposing unnecessary restrictions on ethical debt collectors.'"  Clark v. Capital Credit & Collection Services, Inc., 460 F.3d 1162, 1169-70 (9th Cir. 2006), *aff'd* 198 Fed.Appx. 623 (9th Cir. (Or.) Aug. 24, 2006) (a case articulating a new waiver of protections standard), *quoting* S.Rep. No. 95-382, at 1 (1977), *reprinted in* 1977 U.S.C.C.A. N. 1695, 1696, 1698-99.  The legislative objective was "to eliminate abusive debt collection practices

---

[53]  The FDCPA provides, in pertinent part:  "A **debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt**.  Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . . (2) The false representation of -- (A) the character, amount, or legal status of any debt; . . . (10)  The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."  15 U.S.C. § 1692e (emphasis added).

[54]  GC Services summarizes the statute's list of sixteen representative types of conduct that violate the Act, classifiable into four general categories:  "(1) misrepresenting the identity or affiliation of the debt collector; (2) misrepresenting the debt collector's function; (3) misrepresenting why the debt collector has called the alleged debtor; and (4) misrepresenting the consequences of non-payment of debt."  Mot. P&A 20:15-21:2.  None of the other 16 enumerated types of conduct proscribed by 15 U.S.C. § 1692e is alleged or inferrable from the facts of this case.  The "false representations" component of the FDCPA claim against GC Services is unsupported by any evidence.  In particular, Ms. Thomasson testified she paid the $25.00 Telecheck debt GC Services contacted her to collect based on information provided by its client,  and Mr. Thomasson testified GC Services never contacted him at all after the first written notice of its $28.61 collection effort on behalf of MCI, and closed the account after he notified them he disputed the debt.  Similarly, Plaintiffs understandably do not rely on any provision of 15 U.S.C. 1692f proscribing particular types of "unfair practices," as GC Services never called Plaintiffs on the phone or otherwise pursued any debt collection measures after the initial written communications.

by debt collectors . . . ."  15 U.S.C. § 1692(e).  The FDCPA both requires and proscribes specific conduct by debt collectors.  For example, the statute prohibits the use of any "false, deceptive, or misleading *representation or means* in connection with the collection of any debt."[55]  15 U.S.C. § 1692(e) (emphasis added).   In determining whether a debt collector has violated the FDCPA, courts apply an objective standard measured by how the least sophisticated consumer would interpret the collector's communication.  Dunlap v. Credit Protection Ass'n L.P., 419 F.3d 1011, 1012 (9th Cir. 2005) (affirming dismissal of action and finding a collection agency's notice to a debtor of an outstanding debt would not impermissibly mislead a least sophisticated debtor into believing that his credit would be damaged by failure to pay a *de minimus* debt and therefore did not violate the FDCPA).  The emphasis is on the *communication from* the debt collector associated with the collection of debt, to protect consumers from abusive tactics.  As stated in a case relied on by Plaintiffs, but in the context of written communications:

> It is the provisions of the FDCPA that by and of themselves determine what debt collection activities are improper under federal law.  **If the statute applies** to [defendant's letter to plaintiff] **and** the letter does not comply with the FDCPA's requirements, then by definition it constitutes an improper debt collection activity under federal law.

Romea v. Heilberger & Associates, 163 F.3d 111, 119 (2nd. Cir. 1998) (emphasis added).

Ms. Thomasson acknowledged the validity of her debt by paying the Telecheck account associated with GC Services' written notice.  The record indicates after Mr. Thomasson called GC Services in response to its one written notice of an MCI account balance to dispute his MCI account had a balance owing, GC Services never contacted him again and closed the collection account.  Plaintiffs have produced no evidence to support an allegation that GC Services "falsely represented"

---

[55]   The FDCPA targets only those debt collection practices that are intended to abuse, harass, or oppress debtors in the course of collection efforts, such as: "obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process." S. Rep. No. 95-382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News 1695, 1696.  Abusive practices targeted by the FDCPA which give rise to the typical litigation by a debtor against a third-party debt collector to whom a creditor's account has been turned over include such conduct as:  the debt collector calling at unusual times; threatening to contact and disclose information to the debtor's employer (or actually doing so), false threats of filing a lawsuit (or actually filing one) against the debtor, false threats of garnishing the debtor's wages, false threats of filing a bankruptcy action against the debtor, screaming abuse, and claiming amounts not owed by the debtor.  82 AmJur PQF 3d335, Appendix A, Advisory Opinion (Mar. 31, 2000), § 4.

any aspect of the MCI or Telecheck debts the company was engaged to collect from Plaintiffs, and no reasonable factfinder could conclude on this record GC Services treated either named plaintiff in an abusive or deceptive manner proscribed by the FDCPA with respect to the character or legal status of the alleged consumer debts (FAC ¶ 49(b)), satisfying the summary judgment standard on that FDCPA theory.  Plaintiffs' produce no evidence to support the FAC's bare allegation GC Services falsely represented the character and legal status of the alleged debts, eliminating that theory of FDCPA recovery for failure to satisfy their shifted burden on summary judgment.

Accordingly, the only surviving allegation under this theory is that not revealing to consumers a telephone conversation with a debt collector might be internally monitored in the normal course of business by a collection company supervisor constitutes a *per se* violation of the FDCPA, irrespective of the validity of the collection effort, the responsiveness of the collector to the purported debtor's concerns, or any actual monitoring of the particular call(s).  In order to prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue as to any material fact ***and that the moving party is entitled to judgment as a matter of law***.  Rule 56(c); Celotex, 477 U.S. at 322.  GC Services disputes the practice of non-disclosure of possible monitoring of conversations within the company can support a FDCPA violation allegation, arguing the failure to make a disclosure of call monitoring polices is not the type of misconduct that the FDCPA is designed to prevent.  "Section 1692e is aimed at preventing deception in written and oral communications made by debt collectors to consumers. . . ."  Mot. 21:3-4.  Plaintiffs rely on the tenuous inference such "deception" might cause debtors "more freely" to provide information necessary to establish the validity of the debt GC Services contracted to investigate and collect for its clients than if they were alerted the debt collector's supervisor might also hear the conversation.

Plaintiffs cite no controlling legal authority to establish conduct alleged in their FAC falls within the scope of the FDCPA's prohibition against the use of "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  They identify no particular statement or "representation" from GC Services as the foundation for the suit.  The court notes these Plaintiffs themselves initiated each of their telephone conversations with GC Services, knowing they were calling a debt collection service and intending to clarify and resolve a

1   particular alleged debt.  Plaintiffs acknowledge they had accounts with the creditors on whose behalf

2   GC Services was acting.  They appeared willing to speak to whoever answered the phone.  The

3   obvious job of a collection agency's  representative is to report the results of the collection effort to

4   the agency and the agency's clients on whose behalf the collector acts for that very purpose.  Plaintiffs

5   allege no contact initiated by GC Services other than the initial mailing of apparently unobjectionable

6   written collection notices regarding their MCI and Telecheck accounts, providing information how to

7   respond to the creditor's claim.

8        Moreover, as traced above, GC Services produced evidence of its policy and instructions to

9   its agents to give the QMD/mini-Miranda disclosing its call monitoring policies to debtors in all

10  telephone conversations after they ascertain to whom they are speaking.  The burden shifted to

11  Plaintiffs to produce evidence, not merely conclusory characterizations, that could convince a

12  reasonable factfinder GC Services fails to advise of call monitoring policies and that conduct

13  constitutes an abusive, harassing, or oppressive practice within the scope of the FDCPA.  The burden

14  also shifted to Plaintiffs to provide evidentiary support for their allegations GC Services' conduct

15  causes consumers to be misled into revealing more personal information associated with the debt

16  collection activity to a GC Services employee they randomly reached by placing a call to the known

17  debt collection entity in response to a written notice  than they otherwise would have had they known

18  a GC Services supervisor might internally monitor the call.  The evidence here conclusively establishes

19  each of these Plaintiff acquired actual knowledge in the course of their first conversation of the

20  potential GC Services might monitor their calls.

21       Without finding any facts on the merits, from the evidentiary record presented, the court

22  concludes no reasonable jury could find that any omission of the call monitoring advisement is other

23  than contrary to GC Services' policy or that  such "misconduct" rises to the level of an FDCPA

24  violation.  GC Services did not place any calls to these plaintiffs associated with its written debt

25  collection communications.  Plaintiffs received an accurate answer to their inquiries regarding the

26  potential for call monitoring during the course of their initial conversations.

27       The Ninth Circuit has concluded the FDCPA is a strict liability statute.  Clark, 460 F.3d at

28  1176-77 (adopting the view the FDCPA is a strict liability statute on grounds "[r]equiring a violation

1   of § 1692e to be knowing or intentional needlessly renders superfluous § 1692k(c)," so that "intent is

2   only relevant to the determination of damages");   Taylor v. Perrin, Landry, deLaunay & Durand, 103

3   F.3d 1232, 1238, 1239 (5th Cir. 1997) ("the fact that violations were innocuous and not abusive may

4   be considered only in mitigating liability, and not as defenses under the Act").  The Clark court

5   endeavored "to adopt a construction of the FDCPA that recognizes 'there is room within the [FDCPA]

6   for ethical debt collectors to make occasional unavoidable errors,' and avoids imposing unreasonable

7   restrictions on the collection of debt."  Clark, 460 F.3d at 1179, quoting Beattie v. D.M. Collections,

8   Inc., 745 F.Supp. 383, 392 (D. Del. 1991) (granting in part defendant debt collectors' summary

9   judgment motion ).  The Beattie court pursued the two-step process to determine whether a violation

10  of the FDCPA occurred in circumstances where, among other things, plaintiffs alleged under specific

11  subsections of Sections 1692e, 1692d,  and 1692g:   the defendant agency failed to disclose in each

12  communication with them it was attempting to collect a debt and that any information obtained would

13  be used for that purpose; mistaken attempts to collect from individuals not legally obligated to pay the

14  debt; threats to take actions not legally permissible and not intended to be taken; and conduct whose

15  natural consequence is to harass, oppress, or abuse a person in connection with the collection of a debt.

16  First, the court interpreted the pertinent sections of the statute as a matter of law.  Then, the court made

17  the determination whether defendants' activities violated the statute as interpreted by the court.

18      In this case, the court finds as a matter of law the conduct Plaintiffs allege in this case on this

19  evidentiary record falls outside the scope of conduct targeted by the FDCPA, as they identify no abuse

20  or deception associated with GC Services' debt collection communications.  Moreover: "Logically,

21  if a debt collector reasonably relies on the debt reported by the creditor, the debt collector will not be

22  liable for any errors."[56] Clark, 460 F.3d at 1177.

23      Even had Plaintiffs carried their burden to raise a triable issue of material fact associated with

24  their allegations of FDCPA violations, the statute recognizes a bona fide error defense to strict liability.

25  See 15 U.S.C. § 1692k(c) (defense available to debt collectors who demonstrate that the violation was

26  not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures

27  _____

28      [56]    Although "the bona fide error defense will not shield a debt collector whose reliance on the
    creditor's representation is unreasonable or who represents to the consumer a debt amount that is different from
    the creditor's report" (Clark, 460 F.3d at 1177), no such facts are present here.

1   reasonably adapted to avoid such errors).   GC Services pleads *bone fide* error as its Seventh

2   Affirmative Defense.  FAC Ans. 7:23-27.  Plaintiffs' reliance on 15 U.S.C. § 1692k for their statutory

3   damages relief, read in context and from the record before the court, permits a finding GC Services

4   met its burden to produce evidence to establish the elements of that affirmative defense.

> A debt collector may not be held liable in any action brought under this
> subchapter if the debt collector shows by a preponderance of evidence
> that the violation was not intentional and resulted from a *bona fide* error
> notwithstanding the maintenance of procedures reasonably adapted to
> avoid any such error.

8   15 U.S.C. § 1692k(c) (emphasis added); Clark, 460 F.3d at 1176-77.

9        In summary, Plaintiffs have not carried their burden to produce evidence sufficient to raise a

10  triable issue of material fact whether GC Services violated either the  FDCPA prohibitions alleged or

11  failed to maintain procedures reasonably adapted to avoid errors resulting in FDCPA violations.  Even

12  if they had, GC Services' formal procedures target avoidance or correction of any failure to inform the

13  consumer of the company's call monitoring policy, entitling it to benefit from the *bona fide* error

14  affirmative defense.  Moreover, Plaintiffs produce no evidence their calls to GC Services were actually

15  monitored.  The Motion for summary adjudication of the FDCPA claim is accordingly **GRANTED**.

16                    **3.     Preemption**

17       GC Services argues plaintiffs' reading of the California Invasion of Privacy Act, §§ 630 *et seq.*

18  ("CIPA") conflicts with federal law and is therefore preempted.[57]  Mot pp. 16-18.  CIPA is privacy

19  legislation enacted, among other things, to prohibit recording or eavesdropping on confidential

20  communications without the consent of the parties to the communication.   In the absence of a

21  developed evidentiary record, the court previously declined to find as a matter of law the Second and

22  Third causes of action (*i.e.,* illegal recording and illegal monitoring of telephone communications,

23

24

_____

25       [57]  The issues associated with GC Services' contention CIPA is preempted by the federal Omnibus
         Crime Control and Safe Street Act, 18 U.S.C. §§ 2510, *et seq.* ("Title III"), in pertinent part prohibiting the
26       interception of oral and wire communications (with certain exceptions), is discussed in the Order Denying
         Motion For Partial Judgment On The Pleadings. *See* Dkt No. 52.  Plaintiffs clarified at that time they are not
27       pursuing recovery for "eavesdropping" under CIPA § 631 (*i.e.,* wiretapping), but rather are proceeding only
         under CIPA § 632. Id. p.7, n.5. "Every person who, intentionally and without the consent of all parties to a
28       confidential communication . . . eavesdrops upon or records such confidential communication," by its own
         terms, violates CAL. PENAL CODE § 632.

respectively) are necessarily preempted by federal law.[58]  Dkt No. 52, p. 13.  The court concludes the CIPA claims specific to the recording and monitoring of calls as presented in the FAC are not preempted by the FDCPA prohibitions against false, deceptive, or abusive collection practices for the reasons discussed above and the differing scope of those statutes.

GC Services also argues Plaintiffs' CIPA claims are preempted by the California Public Utilities Commission ("CPUC") regulations controlling business call monitoring, so Plaintiffs purportedly cannot proceed under the CIPA for either of their state law claims:  business "call monitoring (as opposed to 'eavesdropping') is not prohibited by CIPA."  Reply 3:12-13.  The court finds it need not reach the CPUC preemption argument.  As noted by GC Services, the gravamen of Plaintiffs' complaint is the issue of *non-disclosure*, under *either* CIPA or the CPUC:

> If a disclosure is the linchpin of liability that plaintiffs claim it to be -- **under CIPA *or* the CPUC regulations** that [purportedly] actually govern this dispute -- GC Services is entitled to summary judgment because the evidence in this case points in only one direction.

Mot. 16:6-8 (emphasis added).

### 4. <u>Second Cause Of Action</u>

Two of Plaintiffs' three causes of action rely on CIPA§ 632 as the basis for liability.[59]  The Second Cause Of Action alleges "illegal recording of conversations" between the consumer putative

---

[58]  The decision was also colored by the fact Plaintiffs at that time continued to invoke various and potentially divergent privacy statutes from other states and commonwealths as part of their allegations associated with the alleged privacy violations, whereas only the claims under California's CIPA remain viable now.  The court also declined to rule from the face of the pleadings alone whether GC Services actually operates within an ordinary course of business exception to CIPA it contends exists,  and noted resolution of those issues would require elaboration of the facts associated with GC Services' actual conduct, equipment, and manner of use in its debt collection business.  Dkt No. 52, 19:8-11.

[59]  CAL. PENAL CODE § 632 provides, in pertinent part (emphasis added):  "(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, **eavesdrops upon or records** the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished . . . [¶]  (b) The term "person" includes an individual, business association, partnership, corporation, limited liability company, or other legal entity, and an individual acting or purporting to act for or on behalf of any government or subdivision thereof, whether federal, state, or local, but excludes an individual known by all parties to a confidential communication to be overhearing or recording the communication. [¶] (c) The term "confidential communication" includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made . . . in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded. . . ."

class members and GC Services' collection personnel, "in violation of applicable state/commonwealth laws prohibiting the recording of telephone calls without two-party consent." FAC 11:5-6; FAC ¶ 52. Only California law remains at issue.[60]  Plaintiffs seek statutory damages and injunctive relief for alleged "illegal recording of conversations." FAC 11:5-6. The survival of this claim depends, at a minimum, on a showing GC Services, through its employees, actually "surreptitiously" recorded telephonic "confidential communications" with Plaintiffs.

The evidence presented in support of the Motion conclusively establishes the tape recording of communications does not occur at GC Services' California locations.  For example, in response to Plaintiffs' Interrogatory No. 6, GC Services states "**it does not record telephone conversations it conducts with alleged debtors in California**." Schroth, Jr. Exh. C, 7:9-10.  It identifies the make and model of its telephone equipment and substantiates that equipment has no recording capability. Wojcicki Depo. 101:1-7; Joint Statement of Undisputed Facts.[61]  GC Services employees testified no recording of debt collection communications between consumers and GC Services occurs in connection with its debt collection services for such clients as MCI and Telecheck.  GC Services' Interrogatory responses also substantiate it records no calls in California.

Despite the Joint Statement, Plaintiffs unreasonably continue to emphatically argue:  "GC Services admits it monitored calls within the applicable time frame **and the** [unspecified] **evidence shows its calls were also recorded.  Liability is conclusively established**." Opp. 8:1-3 (emphasis added). The court is directed to no such "evidence."  Plaintiffs elsewhere state:  "There can be no question in law or fact that confidential communications between consumers and GC Services are monitored **and recorded** (Opp. 13:3-4), again with no evidence for those categorical contentions.  The evidence, by Plaintiffs' own concession in the Joint Statement, conclusively establishes GC Services *does not have the capability* to record monitored calls at its California locations.

---

[60]  CIPA protects only California residents communications while they are in California, so the CIPA claims of any non-residents initially proposed as putative class members could not proceed on that theory, even if the action had not already been narrowed to a California resident putative class. *See* Kearney, 39 Cal.4th 95.

[61]  The parties' Joint Statement of Undisputed Facts establishes GC Services' call centers in California utilize Nortel's "Meridian 1" telephone system, a "commercially available business telephone system" which does "not have the capacity to record telephone conversations," even though it "does provide for restricted access by GC Services' managers to monitor its debt collection calls." Undisputed Facts 2-3.

In addition, GC Services produces unrefuted evidence it does not record conversations associated with any of its debt collection services.  Any recording of communications by GC Services occurs only in the company's telemarketing call monitoring or customer care monitoring, ***not in GC Services debt collection activities***, which is a third and separate service the company offers.

> Q.  Does GC Services record telephone conversations between debt collectors employed by GC Services and any other persons?
>
> A.  No.
>
> Q.  Ever?
>
> A.  Not that I'm aware of.
> . . .
> Q.  . . . How about debt collection conversations?  Are any of those recorded?
>
> A.  No.

Wojcicki Depo.  pp. 53-59, 66.

The court finds GC Services is entitled to summary adjudication of this claim as a matter of law, and the Motion accordingly is **GRANTED** with respect to the Second Cause of Action.

### 5.   Third Cause Of Action

The Third Cause of Action alleges GC Services illegally monitors or eavesdrops on its own telephone conversations without the consent of the participating putative class members, in violation of California's CIPA statute criminalizing invasions of privacy.  FAC ¶¶ 52-53.  Plaintiffs seek statutory damages and injunctive relief for alleged "illegal monitoring/eavesdropping of conversations."   FAC 12:14-15.   The court construes the "eavesdropping" conduct and the "monitoring" conduct to be co-extensive in this case, as no third-parties beyond GC Services' employees and Plaintiffs are alleged to have participated, and Plaintiffs rely solely on CIPA § 632.

Plaintiffs allege in support of this claim GC Services "has allowed, enabled and encouraged certain of its personnel employed by Defendant GC SERVICES to secretly listen in on telephone conversations between persons who are alleged to owe money and [other] individuals employed by Defendant GC Services" and that conduct allegedly constitutes a violation of CIPA.  FAC ¶ 58.  GC Services admits it randomly monitors some of the debt collection calls between its employees and consumers transpiring in the normal course of its third-party debt collection business.  GC Services

has produced evidence of its policies with respect to that practice, substantiating its formal procedure is for its employees to provide the advisement of possible call monitoring for quality control, as discussed above.   Wojcicki Depo 151:2-6;[62] *see* the evidentiary foundation associated with the discussion of the First Cause Of Action, above.

The court has rejected Plaintiffs' conclusory representations that "there is no other conclusion but that GC Services['] [alleged] failure to provide an advisement prior to its calls with consumers being monitored or recorded is consciously false, deceptive, and misleading under the FDCPA." Opp. 17:4-7.  The court  also rejects their effort, based solely on the strength of argument and self-serving affidavits, to defeat GC Services' evidentiary showing its established policies, practices, and procedures entail a "mini-Miranda" or "QMD" advisement that telephone calls may be monitored.[63]

Nevertheless, "[a]ssuming for the sake of argument that business call 'monitoring' equates to 'eavesdropping' under CIPA, there can be no CIPA liability unless the plaintiff's calls were in fact monitored." Mot. P&A 23:20-22. The FAC allegations go only so far as to say Plaintiffs' calls "may" have been monitored. Plaintiffs remain unable at this late stage in the litigation to advance beyond that speculative representation in the FAC, a deficiency affecting not only their standing to pursue relief for a harm they are unable to prove they suffered but also their ability to prevail on the Third Cause Of Action.  On a shifted burden, Plaintiffs' obligation is to present "significant probative evidence tending to support its claim. . . ."  Intel Corp., 952 F.2d at 1558.  They offer only the inadequate conclusory allegations in their own affidavits, unsupported by factual data, an insufficient showing to oppose summary adjudication of the claim in GC Services' favor. *See*  Hansen, 7 F.3d at 138.

\\

---

[62]   "Q.  Are the GC Services employees advised to tell persons who are engaged in telephone conversations with them that the call could be monitored? A. Yes. Q. Do they give that advisement? A. Yes." Wojcicki Depo. 151:2-8. Mr. Wojcicki testified the monitoring forms evaluating calls records whether the notice was not given; if there is no reference on the monitoring form, then the notice was given. Id. 151:10-21.  GC Services has written policies for the protection of personal/financial information. Id. 161:14-18.

[63]   The evidence demonstrates that GC Services trains its collectors to deliver a "QMD" -- quality monitoring disclosure -- in all business telephone calls. McFarlane Dep. at 79:4-16. GC Services' managers monitor collector performance of this task and intervene in any telephone call where the QMD is not given before business is conducted in the call. *Id.* at 25:21-26:5; Stevens Dep. at 26:10-17." Mot. 16:9-14.  GC Services "discloses its quality monitoring program to every in-bound and out-bound caller." Mot. 16:8-9. Any failure to do so must be construed on the evidentiary record presented as contrary to company policy.

1    Even if supervisory employees of GC Services could be deemed "third-parties" with respect

2    to conversations between other GC Services employees and consumer debtors (a dubious contention),

3    GC Services shifted the burden to Plaintiffs to produce evidence it monitored any of the Thomasson

4    conversations.  In reliance on discovery responses it provided under court order to produce a list of

5    names, addresses, and telephone numbers of debtors whose conversations GC Services monitored, GC

6    Services denies it ever monitored any of the Thomassons' communications with the company.[64] Mot.

7    P&A 24:17-22, *citing* Exh. 7 at p. 15. "There is a complete evidentiary failure to support their

8    individual claims and, absent some real factual support, plaintiffs' 'beliefs' do not suffice to defeat

9    summary judgment." Mot. P&A 24:22-25:2, *citing* FTC v. Publishing Clearing House, Inc., 104 F.3d

10   1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any

11   supporting evidence, is insufficient to create a genuine issue of material fact"); Stevens v. County of

12   San Mateo, 2006 WL 581092 at *9 (N.D.Cal. Mar. 7, 2006) (granting summary judgment to defendant

13   where defendant produced documents refuting plaintiff's claims, and plaintiff lacked any factual

14   support other than self-serving affidavit), *citing* FTC, 104 F.3d at 1171.

15   Plaintiffs cite no evidentiary support for their conclusory allegation, contradicted by the

16   testimonial evidence: "The [monitoring] advisement, therefore, is **often** not given **so that** consumers

17   will **mistakenly believe they are not being** monitored or recorded." Opp. 16:25-26 (emphasis added).

18   The testifying GC Services supervisors all allude to the "mini-Miranda" or "QMD" advisement as a

19   required component of collection communications ("talk out").  Moreover, the Thomassons knew from

20   the first call either placed to GC Services in response to the debt collection letters the conversation

21   might be internally monitored by the company because each asked and was told so.  Any of their calls

22   thereafter must be construed as placed with knowledge of the potential for monitoring by company

23   representatives other than the individual who answered the phone at GC Services.[65]

24

---

25   [64]   Plaintiffs implicitly acknowledge a difference between consumers solicited by phone and

26   consumers responding to a notice of alleged debt: "Individuals *are called by* GC Services in the search for
     money . . . .With each such call, *a GC Services employee -- a stranger to the person called --* is *requesting*

27   names, addresses, telephone number, and other private and confidential information." Opp. 12:22-24.

28   [65]   Plaintiffs' Opposition obstinately insists, contrary to summary judgment review standards and the
     evidentiary record, "[t]he Thomassons have provided enough evidence to prevail at trial and GC Services has
     utterly failed to meet its burden in this motion by proffering statements based on admittedly falsified and

1   The court is under no obligation to "scour the record in search of a genuine issue of triable

2   fact," nor need it "examine the entire file for evidence establishing a genuine issue of fact, where the

3   evidence is not set forth in the opposition papers with adequate references so that it could be

4   conveniently found." *See* <u>Keenan</u>, 91 F.3d at 1278; <u>Carmen</u>, 237 F.3d at 1031.  Plaintiffs argue from

5   their beliefs, suspicions, and bare allegations rather than identifying specific, admissible evidence in

6   the voluminous record presented that could permit a reasonable factfinder to find in their favor.

7   Absent a showing of personal injury, these plaintiffs do not have standing to pursue this claim or this

8   litigation, on their own behalf or as putative class representatives.  <u>Cook Treaty Tribes</u>, 166 F.3d at

9   989.  As with the First and Second causes of action, the court finds GC Services is entitled to judgment

10  as a matter of law on its Third Cause of Action, and the Motion is **GRANTED** in its entirety.

11          **E.      Motion To Certify Class**

12          In consideration of the ruling on GC Services' Motion For Summary Judgment, Plaintiffs'

13  Motion To Certify Class is **DENIED AS MOOT**. Even had this action survived summary judgment,

14  the court would have denied the motion on the merits as based on allegations and class descriptions

15  from an SAC that was not authorized to be filed and therefore irrelevant to the disposition of the class

16  certification issues in the operative pleading.

17          **F.      Motion For Limitation On Communication With Putative Class Members And
                     Sanctions**

18
19          The relief pursued in defendant's Motion For Limitation On Communication With Putative

20  Class Members is necessarily resolved by the grant of summary judgment on the merits of the claims

21  and rejection of the named plaintiffs' standing to represent the alleged class.  Accordingly, this Motion

22  is **DENIED AS MOOT**.

23  **III.   CONCLUSION AND ORDER**

24          For all the foregoing reasons, **IT IS HEREBY ORDERED:**

25          1.      Defendant's Motion For Summary Judgment is **GRANTED**.

26  incomplete 'documentary evidence,'" in opposition to GC Services' contention Plaintiffs are unable "to
    demonstrate [they were] monitored, save for [their] belief it is so."  Opp. P&A 25:10-16.  They argue the
27  "belief stems from an admission of a GC Services employee, an admission that GC Services has not disputed
    in its moving papers despite its knowledge as to where the information emanates -- its own employees" (Opp.
28  P&A 25:11-13), alluding presumably to the isolated, abberational instances of oversight or misconduct Bond
    and others testified would be stopped if detected by a supervisor.

1      2.    Defendant's Motion For Limitation On Communications With Putative Class Members

2  is **DENIED AS MOOT**.

3      3.    Plaintiffs' Motion to Certify Class is **DENIED AS MOOT**.

4      4.    The Clerk of Court shall terminate the case.

5      5.    The parties shall jointly and promptly arrange to pick up the chambers copy of the

6  exhibits filed under seal associated with these motions.

7      **IT IS SO ORDERED**.

8  DATED:  July 13, 2007

9

10  **HONORABLE LARRY ALAN BURNS**
United States District Judge